132 P.3d 789 (2006)
132 Wash.App. 546
Stacy L. HEGWINE, Appellant,
v.
LONGVIEW FIBRE COMPANY, INC., a Washington corporation, Respondent.
No. 33174-8-II.
Court of Appeals of Washington, Division 2.
April 25, 2006.
*790 William L. Dowell, Attorney at Law, Longview, WA, Nancy Williams, Perkins Coie LLP, Seattle, WA, for Respondent.
Mark Stanley Brumbaugh, Walstead Mertsching PS, Longview, WA, for Appellant.
VAN DEREN, J.
¶ 1 Stacy Hegwine sued Longview Fibre Company (Fibre) in Cowlitz County Superior Court alleging that Fibre discharged her *791 from employment based on her gender and pregnancy in violation of RCW 49.60.180, the Washington Law Against Discrimination (WLAD). A bench trial resulted in a judgment for Fibre based on a disability accommodation analysis. We reverse and remand for determination of Hegwine's damages, holding that disability accommodation analysis does not apply and that Fibre impermissibly assumed that her pregnancy constituted a temporary disability that it could not accommodate and wrongly fired Hegwine in violation of RCW 49.60.180 and WAC 162-30-020 because she was pregnant.

FACTS
¶ 2 Hegwine applied for the customer service clerk/order checker position in Fibre's customer service department in late 2000. The newspaper advertisement for the job indicated that Fibre was accepting applications for clerical work and that it preferred "2 years full-time related experience of [sic] equivalent education," personal computer abilities, and demonstrated communication skills. Exhibit 1. It mentioned no lifting requirements.
¶ 3 Carlene Cox and Ron Samples[1] interviewed Hegwine on February 16, 2001. Fibre had no documented job description for the position when Hegwine interviewed. During the interview, however, Ron Samples explained to Hegwine that the job included a 25 pound lifting requirement.[2]
¶ 4 Cox offered Hegwine the position on February 21, 2001, contingent upon Hegwine's successful completion of a physical examination. Cox did not define what "successful" completion of the physical entailed. Hegwine accepted the offer over the telephone and told Cox that she was quitting her current job to take the order checker position. Cox then gave Hegwine a start date of March 1, 2001.
¶ 5 Hegwine completed her physical at the office of Dr. Ostrander, Fibre's Corporate Medical Director, on February 23, 2001. During the physical, ostensibly through a questionnaire given to Hegwine that asked, among other things, if she were pregnant, Ostrander learned that Hegwine was pregnant and informed her that she would need her attending physician, Dr. Herron, to provide medical clearance before she could begin working at Fibre.[3]
¶ 6 Hegwine reported for orientation on March 1, 2001. In addition to watching a series of videos about employment at Fibre, she was also given a variety of documents outlining Fibre's employment policy, vacation and sick leave, employer-provided healthcare benefits, pension benefits, and 401(k) plan information. Hegwine also completed a W-4 tax form and received a payroll number.
¶ 7 During orientation, Cox explained that Fibre had a maternity leave policy. Hegwine disclosed to Cox that she was pregnant. After learning this fact, Cox had the customer service department's supervisor escort Hegwine to Samples' office to review her job duties. While Samples occupied Hegwine, Cox contacted Ostrander's office to determine the status of Hegwine's physical examination. Ostrander's office told Cox that Hegwine's physicians had not provided Fibre with medical clearance regarding her pregnancy.[4]
¶ 8 Cox then told Hegwine to leave Fibre's premises while the situation was resolved because Hegwine had not successfully completed her physical. Cox contacted Herron's office and requested Hegwine's completed *792 medical clearance form.[5] Thereafter, Cox informed Hegwine that she had lifting restrictions, that Herron had released her to lift only 20 pounds, and that Fibre would be in touch once proper documentation had been submitted. Cox's representations to Hegwine did not comport with Herron's actual statements to Fibre.
¶ 9 After Hegwine left Fibre at Cox's direction, she called Herron's office to explain what had happened at Fibre and that she had been told the lifting requirement was 25 pounds. Even though his first form exceeded the stated lifting requirement, she asked that Herron increase the lifting restrictions listed on the original medical release form. Herron's office asked Hegwine to contact Fibre to determine what the actual lifting requirements were. Hegwine talked to Marilyn Sapp in Ostrander's office. Based on information Hegwine obtained from Sapp, Herron submitted a revised medical clearance form on March 1, stating that Hegwine could lift up to 40 pounds to her waist, shoulders, and overhead for up to two hours a day.[6] Herron assumed that this revision would be sufficient for Hegwine to begin work at Fibre.
¶ 10 Because the two medical clearance forms differed, Ostrander contacted Herron on March 5 to determine which form properly identified Hegwine's limitations. The doctors clarified the restrictions in a third form, clearing Hegwine to lift 20 pounds frequently, 40 pounds occasionally to infrequently, and to stand for four to six hours at a time.[7] At trial, Herron testified that if he had been informed that the position's lifting requirement was 60 pounds, he may have provided medical clearance, depending on the nature and frequency of the lifting.[8]
¶ 11 After receiving the third medical clearance form, Fibre directed its Equal Employment Opportunity Coordinator (EEOC), Margaret Rhodes, to conduct an analysis of the order checker position to establish the position's essential job functions. Rhodes analyzed the order checker position generally and addressed whether Hegwine was capable of carrying out the essential functions of the order checker position given the limitations listed in her medical clearance form.
¶ 12 Rhodes determined that an order checker must be able to lift boxes weighing up to 60 pounds, carry them 15 to 30 feet and down three or four steps, load them onto the back of a small Daihatsu truck, drive them to another building, unload them onto a hand truck, and pull them to another location.[9]
¶ 13 When evaluating whether Hegwine could perform the order checker position, Rhodes relied on the information in Herron's third medical clearance form and did not (1) inform Hegwine or Herron that the job now had a 60 pound lifting requirement; or (2) inquire whether Hegwine could in fact meet this new requirement. Based on the 40 *793 pound lifting limitation in the third medical report, Rhodes wrote a final report stating that Hegwine did not meet the order checker position's mandatory requirements because her pregnancy temporarily limited her lifting ability.
¶ 14 Rhodes' trial testimony contradicted the written report she submitted. She testified that it would have been appropriate, given Hegwine's pregnancy, to temporarily transfer her to a sedentary relief clerk position as that had been Fibre's past practice.[10] Further, Rhodes testified that Fibre could reasonably accommodate Hegwine to assist her in performing the lifting functions of the order checker position and that Fibre could do so without significant difficulty, disruption, or expense. Rhodes then testified that she prepared a handwritten version of the final, typewritten report but did not enter this latter information into the final typewritten report because "it was determined [by leadership], beyond my area of expertise," that Hegwine's temporary disability due to pregnancy prevented her from performing an essential function of the order checker position, and therefore, no further analysis needed to be conducted. RP (Mar. 14, 2005) at 131. Rhodes testified that Arkell directed that accommodations for Hegwine not be considered.
¶ 15 But Arkell testified that he considered whether Fibre could accommodate Hegwine and determined that it could not. He further testified that although he did not have Rhodes' earlier handwritten form outlining her accommodation recommendations, he would have considered it irrelevant anyway and that he would have disregarded her opinion on both the accommodations and whether the "law required something more." RP (Mar. 15, 2005) at 219. He also did not agree that it was Fibre's past practice to provide temporary sedentary work for those with temporary disabilities.
¶ 16 Arkell made the final decision to rescind Hegwine's offer of employment, based on her alleged lifting restriction. On March 16, 2001, Cox called Hegwine to inform her that Fibre was "withdrawing [its] offer of employment" because her "availability" disallowed her to perform the job. Clerk's Papers (CP) at 17; Exhibit 11. As directed by her superiors, Cox kept the conversation short and in conformity with a drafted script.
¶ 17 It is not contested that Hegwine's potential lifting restriction was temporary and due solely to her pregnancy. It is also not contested that Hegwine did not inform Fibre of any disability, nor did she ask for accommodation.
¶ 18 Hegwine sued Fibre alleging, among other things, that Fibre discharged her from employment because of her gender and pregnancy in violation of RCW 49.60.180 (WLAD). The trial court granted a judgment in favor of Fibre based on the disability accommodation analysis Fibre argued. It concluded that Fibre could not accommodate Hegwine's pregnancy-related temporary lifting restriction.
¶ 19 Hegwine appeals.

ANALYSIS

I. STANDARD OF REVIEW
¶ 20 When a trial court has weighed the evidence in a bench trial, appellate review is limited to determining whether substantial evidence supports its findings of fact and, if so, whether the findings support the trial court's conclusions of law. Keever & Assocs. v. Randall, 129 Wash.App. 733, 737, 119 P.3d 926 (2005). Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person that a finding is true. In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004). We review only those findings to which appellants assign error; unchallenged findings are verities on appeal.[11]State v. Hill, 123 Wash.2d 641, 644, 647, 870 P.2d 313 (1994). On appeal, we view the evidence in *794 the light most favorable to the prevailing party and defer to the trial court regarding witness credibility and conflicting testimony. Weyerhaeuser v. Tacoma-Pierce County Health Dep't, 123 Wash.App. 59, 65, 96 P.3d 460 (2004).
¶ 21 We review questions of law and conclusions of law de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003). Further, we review conclusions of law erroneously labeled as findings of fact de novo. Keever, 129 Wash.App. at 738, 119 P.3d 926.

II. GENDER DISCRIMINATION
¶ 22 On appeal, the parties agree that Hegwine established a prima facie case of gender discrimination because the evidence was clear that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action was due to her pregnancy.
¶ 23 Hegwine argues that Fibre ended her employment because of a temporary, pregnancy-related lifting restriction and that this contravened RCW 49.60.180 and WAC 162-30-020. She asserts that substantial evidence does not support the trial court's finding of fact number eight,[12] that the ability to lift 60 pounds was an essential function of the job, or the trial court's finding of fact number 11[13] that the position could not be modified to accommodate her pregnancy related lifting restriction.[14]
¶ 24 Fibre maintains that it did not rescind its offer of employment because of Hegwine's pregnancy but, rather, because Hegwine was unable to perform an essential function of the order checker position. But Cox's scripted notes for the telephone conversation with Hegwine state that it was Hegwine's "availability" that made them withdraw the offer. Exhibit 11. And Hegwine's complaint to the EEOC stated that she was told that it was her "time limitations" that made Fibre withdraw the job offer. Exhibit 12.
¶ 25 For the first time on appeal, Fibre contends that an employer may refuse to hire any person who has a temporary disability that Fibre deems prevents them from completing an essential function of the job, that it has no duty to explore accommodation of that disability and, thus, its refusal to continue Hegwine's employment due to her pregnancy was an example of treating both sexes equally. Fibre maintained at the trial court that pregnancy was a temporary disability. On appeal, however, Fibre acknowledges that pregnancy is not a disability. Also on appeal, Fibre argues for the first time that any action Fibre may have taken in response to Hegwine's pregnancy falls under the "business necessity" exception in WAC 162-30-020(3)(b). Br. of Resp't at 24.

A. RCW 49.60.180
¶ 26 RCW 49.60.180, or WLAD, prohibits employers from refusing to hire or terminating the employment of any person because of *795 sex. RCW 49.60.180(1) and (2).[15] RCW 49.60.030(1) declares:
The right to be free from discrimination because of race, creed, color, national origin, sex, or the presence of any sensory, mental or physical disability ... is recognized as and declared to be a civil right. This right shall include, but not be limited to:
(a) The right to obtain and hold employment without discrimination.
¶ 27 WLAD's provisions are liberally construed and exceptions narrowly confined. RCW 49.60.020; Phillips v. Seattle, 111 Wash.2d 903, 908, 766 P.2d 1099 (1989). Our Supreme Court has stated:
that the purpose of the law is to deter and to eradicate discrimination in Washington, Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 309-10, 898 P.2d 284 (1995); Burnside v. Simpson Paper Co., 123 Wash.2d 93, 99, 864 P.2d 937 (1994), and has stated that a plaintiff bringing a discrimination case in Washington assumes the role of a private attorney general, vindicating a policy of the highest priority. This state's strong policy against sex discrimination is further evidenced by its enactment of the Equal Rights Amendment to the state constitution. CONST. art. XXXI, §§ 1-2 (amend.61).
Marquis v. Spokane, 130 Wash.2d 97, 109, 922 P.2d 43 (1996) (citation omitted).
¶ 28 RCW 49.60.180 does not set out the criteria for establishing a claim of sex or disability discrimination. For this reason, our courts have considered interpretations of analogous federal law in discrimination cases. Marquis, 130 Wash.2d at 113, 922 P.2d 43 (sex discrimination); Xieng v. Peoples Nat'l Bank, 120 Wash.2d 512, 844 P.2d 389 (1993) (accent and national origin discrimination); Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 753 P.2d 517 (1988) (age discrimination).
¶ 29 In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court established the elements of a prima facie case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and allocated the procedural burdens of the parties in such a case. In the employment context those burdens are (1) a prima facie showing of discrimination by the employee or potential employee; (2) followed by the employer's articulation of a legitimate, nondiscriminatory reason for its actions toward the employee; and (3) finally, the employee's rebuttal, showing that the employer's stated reasons are mere pretext for what, in fact, is a discriminatory purpose. Grimwood, 110 Wash.2d at 363-64, 753 P.2d 517 (citing Loeb v. Textron, Inc., 600 F.2d 1003, 1011-12, 1014-15 (1st Cir.1979)).
¶ 30 Although these steps are recognized as the proper procedure for the trial of age discrimination cases, our Supreme Court has also adopted the cautionary view expressed in Loeb that McDonnell Douglas "should not be viewed as providing a format into which all cases of discrimination must somehow fit." Grimwood, 110 Wash.2d at 363, 753 P.2d 517 (quoting Loeb, 600 F.2d at 1016-17).
The Supreme Court has made it abundantly clear that McDonnell Douglas was intended to be neither "rigid, mechanized, or ritualistic," Furnco [Constr. Corp. v. Waters,] 438 U.S. [567] at 577, 98 S.Ct. 2943 [57 L.Ed.2d 957 (1978)], nor the exclusive method for proving a claim of discrimination, [Int'l Bhd. of] Teamsters [v. *796 United States,] 431 U.S. [324] at 358, 97 S.Ct. 1843, [52 L.Ed.2d 396 (1977)].
Loeb, 600 F.2d at 1017.

B. WAC 162-30-020
¶ 31 Neither party cites authority interpreting the interplay between RCW 49.60.180 as it relates to sex discrimination and chapter 162-30 WAC (the specific Washington regulations defining unfair employment practices based on pregnancy), and RCW 49.60.180's proscription of disability discrimination. We do note, however, that certain biological and legal principles clearly apply in this case  only women get pregnant and pregnancy is not legally defined as a disability in Washington. WAC 162-30-020(2).
¶ 32 The Washington State Human Rights Commission (WHRC) promulgated chapter 162-30 WAC to deal expressly with sex discrimination. WAC 162-30-020 specifically deals with issues related to pregnancy, childbirth, and pregnancy related conditions.[16] We interpret administrative regulations under the rules of statutory construction. Mader v. Health Care Auth., 149 Wash.2d 458, 472, 70 P.3d 931 (2003). When engaging in statutory construction, our primary objective is to ascertain and give effect to the legislature's intent and purpose in creating the statute. Weyerhaeuser, 123 Wash.App. at 65, 96 P.3d 460. Where a statute uses plain language and defines essential terms, the statute is not ambiguous. McFreeze Corp. v. Dep't of Revenue, 102 Wash.App. 196, 199 n. 1, 6 P.3d 1187 (2000). Thus, we must apply the statute as written if the statutory language is clear; we may not look beyond that language or consider legislative history but should glean legislative intent through the language of the statute itself. Burton v. Lehman, 153 Wash.2d 416, 422, 103 P.3d 1230 (2005); C.J.C. v. Corp. of the Catholic Bishop, 138 Wash.2d 699, 708, 985 P.2d 262 (1999). Furthermore, "[a] court must give great weight to the statute's interpretation by the agency which is charged with its administration, absent a compelling indication that such interpretation conflicts with the legislative intent." Marquis, 130 Wash.2d at 111, 922 P.2d 43 (citing Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 68-69, 586 P.2d 1149 (1978)).
¶ 33 WAC 162-30-020(2)(a) states that "`Pregnancy' includes, but is not limited to, pregnancy, the potential to become pregnant, and pregnancy related conditions." "Pregnancy related conditions" include related medical conditions. WAC 162-30-020(2)(b). Under WAC 162-30-020(3), it is an unfair practice for an employer to refuse to hire or to terminate a woman's employment because of pregnancy. It is also an unfair labor practice to base employment decisions on negative assumptions about pregnant women. WAC 162-30-020(3)(c). In addition to these identified unfair labor practices, an employer may not ask questions about pregnancy before hiring. WAC 162-12-140(3)(n).
¶ 34 WAC 162-30-020(3)(b) states that:
The sole exception to (a) of this subsection is if an employer can demonstrate business necessity for the employment action. For example, an employer hiring workers into a training program that cannot accommodate absences for the first two months might be justified in refusing to hire a pregnant woman whose delivery date would occur during those first two months.
¶ 35 At trial, Hegwine argued that it was improper for Fibre to assert that the court had to determine whether Fibre could reasonably accommodate Hegwine's lifting restrictions. Fibre insisted that the issue of accommodation was essential to protect employers from having to hire temporarily disabled persons and then immediately put them on leave.
¶ 36 On appeal, Fibre now argues that a disability analysis is inappropriate because pregnancy is not a disability. It states, "[t]o the contrary, pregnancy is a normal, expectable incident in the life of a woman." Br. of Resp't at 27 (citing WAC 162-30-020(2)). But in response to the trial court's treatment of her case as one involving disability *797 discrimination, Hegwine now argues that Fibre's rescission of its offer of employment constituted disability discrimination under RCW 49.60.180 and that Fibre failed to provide available accommodations to assist her in meeting the lifting requirement of the order checker position during her temporary lifting restriction time frame.
¶ 37 We agree that disability discrimination analysis is inapplicable here because pregnancy and pregnancy related conditions are not considered "disabilities" under Washington law. See chapter 162-30 WAC. Pursuant to authority delegated by the legislature in RCW 49.60.120(3) to carry out WLAD's provisions, WHRC defines "pregnancy" and "pregnancy related conditions" under chapter 162-30 WAC, entitled "Sex Discrimination." In contrast, WHRC defines "disability" under chapters 162-22 and 162-26 WAC, entitled "Employment  Handicapped Persons" and "Public Accommodations, Disability Discrimination." That WHRC defines these terms in its chapter dealing with sex discrimination and not under its chapters dealing with handicapped persons and disability discrimination indicates intent to not treat pregnancy or any related condition as a disability. See State v. Jacobs, 154 Wash.2d 596, 603, 115 P.3d 281 (2005) (quoting In re Det. of Swanson, 115 Wash.2d 21, 27, 804 P.2d 1 (1990)) ("[W]here the Legislature uses certain statutory language in one instance, and different language in another, there is a difference of legislative intent.").
¶ 38 In short, pregnancy and any related condition is not a disability under Washington law and, therefore, the trial court erred in considering this claim to be a disability discrimination claim.[17] Thus, we review the evidence under the standards applicable to a sex discrimination case as pled by Hegwine.
¶ 39 Here, Fibre hired Hegwine, subject to the completion of a physical examination that entailed answering extensive medical questionnaires. The background medical questionnaire, asked if Hegwine was pregnant. Exhibit 18. Hegwine answered truthfully. When Fibre learned that Hegwine was pregnant, it immediately sent her home from the jobsite. It also required Hegwine to obtain a release from her doctor even though Hegwine *798 neither claimed any disability related to her pregnancy nor requested any accommodation. Instead, Hegwine was compelled to respond to Fibre's immediate assumption that she was disabled due to the pregnancy. This assumption violated WAC 162-30-020(3)(c), while the pregnancy question violated WAC 162-12-140. Likewise, Fibre's refusal to hire (or termination of) Hegwine, whether because of her "availability" or because of any pregnancy related condition, violated WAC 162-30-020(3)(a).[18]
¶ 40 Furthermore, only after March 1, 2001, did Fibre undertake a job analysis of the order checker position. At no time did Fibre communicate a greater lifting requirement to Hegwine, a lack of communication Fibre maintains is appropriate. It was not until 16 days after Cox told Hegwine to leave Fibre's property and terminated her orientation for the job, that Fibre informed Hegwine that the offer was withdrawn because her "availability" disallowed her to perform the job. Exhibit 11.
¶ 41 Similarly, only after she sued Fibre in 2003 did Fibre reveal that it had determined that the order checker job might occasionally require that the employee lift 60 pounds. Although several Fibre employees testified about the 60 pound occasional lifting requirement in 2004, the evidence is unrefuted that there was not a 60 pound lifting requirement for the order checker job before Hegwine revealed her pregnancy. The evidence is unclear when Fibre settled on the requirement. It is thus insufficient to support the trial court's factual conclusion that the 60 pound lifting requirement was a job requirement when Hegwine began orientation on March 1, 2001. That it later became a requirement is irrelevant to Fibre's conduct in terminating Hegwine upon learning of her pregnancy.[19]
¶ 42 Moreover, although Hegwine pled her claim as a sex discrimination case due to the termination of her employment due to her pregnancy, the trial court treated it as a disability discrimination case based on Fibre's arguments at trial. Absent a showing that Hegwine was disabled due to her pregnancy, the trial court's legal conclusion that Hegwine suffered from a "pregnancy-related disability" is erroneous and its finding of fact 11 that Fibre could not accommodate a lifting restriction, elicited at Fibre's direction from Hegwine's doctor, was not supported by the relevant facts.
¶ 43 Thus, the record shows that Fibre failed to demonstrate the existence of a valid nondiscriminatory reason for not hiring or retaining Hegwine on March 1, 2001. Even though it responded to her lawsuit with a facially nondiscriminatory reason, the record contains evidence sufficient to show that it was a pretext to avoid hiring a pregnant woman: (1) the job advertisement listed no lifting requirements; (2) in the interview only 25 pounds was mentioned as a lifting requirement; (3) Hegwine never suggested any pregnancy related limitations to Fibre or its doctor; (4) when Fibre learned Hegwine was pregnant through its mandatory physical, it immediately assumed she had restrictions that her doctor would have to identify; (5) when Hegwine's doctor's permission exceeded the 25 pound lifting requirement, Fibre changed the requirement and told her it *799 was 40 pounds; (6) when Hegwine's doctor submitted a second form responding to the new 40 pound lifting requirement, Fibre's doctor talked to Hegwine's doctor and obtained a third form, still allowing lifting adequate to do the job as explained by Fibre; (7) Fibre then told Hegwine to leave its premises and not return until it had the alleged situation all sorted out; (8) only after Hegwine was removed did Fibre undertake a job analysis that resulted in an even greater lifting requirement  60 pounds; (9) Fibre did not communicate this new requirement to either Hegwine or her doctor; (10) instead, it told Hegwine that her "availability" precluded her from performing the job and therefore "rescinded" her job offer; and finally (11) Fibre altered its position and argued at trial that it rescinded its offer, not because of Hegwine's "availability," but because she could allegedly not perform an essential function of the job that was determined after it rescinded its offer.
¶ 44 Any lifting limitation related to Hegwine's pregnancy was not relevant to the job on March 1, 2001, and the trial court erred in concluding that Hegwine was disabled by a lifting restriction that prevented her from performing the order checker job and that Fibre need not have hired or retained her. Because the evidence does not support Fibre's stated reason for "rescinding" Hegwine's employment, she prevails on her sex discrimination claim.

C. Business Necessity Affirmative Defense  WAC 162-30-020(3)(b)
¶ 45 For the first time on appeal, Fibre argues that its business needs required it to rescind its offer of employment to Hegwine, basing its argument on Washington's regulation stating that an employer under limited circumstances may terminate or refuse to hire a pregnant woman if its business necessities so require. WAC 162-30-020(3)(b).
¶ 46 "Business necessity" is an affirmative defense to the claim of failure to hire or a claim of wrongful firing for pregnancy related conditions and if it is not pled, it is waived. CR 8(c). Fibre did not plead or argue business necessity at the trial court; thus, it waived the defense. But even if we were to reach this issue, Fibre presented no evidence at trial supporting a conclusion that business necessity precluded it from hiring a pregnant woman to fill the order checker position. WLAD's provisions are liberally construed and exceptions narrowly confined. Phillips, 111 Wash.2d at 908, 766 P.2d 1099. Here, Hegwine's delivery date was not until mid-June 2001, over three months after her orientation date of March 1, 2001, and Herron released Hegwine to work up to a week or two prior to her delivery date.[20]

*800 III. ATTORNEY FEES ON APPEAL
¶ 47 Hegwine requests attorney fees under RAP 18.1, which provides for attorney fees and expenses to the prevailing party on appeal if applicable law authorizes such an award. RCW 49.60.030(2) does not specifically authorize an award of attorney fees and expenses to the prevailing party on review, but it has been interpreted by our Supreme Court as granting prevailing parties attorney fees and expenses on appeal. Allison v. Hous. Auth., 118 Wash.2d 79, 98, 821 P.2d 34 (1991). And unlike the plaintiff in McClarty v. Totem Electric, Hegwine is the prevailing party on the merits of her claim and remand is solely to determine her damages. 119 Wash.App. 453, 472-73, 81 P.3d 901 (2003). Thus, as the prevailing party, she is entitled to attorney fees and expenses upon compliance with RAP 18.1.
¶ 48 We remand for determination of damages to Hegwine as a result of Fibre's unlawful discrimination and unfair labor practice in its hiring process based on Hegwine's pregnancy.
We concur: HOUGHTON, J., and QUINN-BRINTNALL, C.J.
NOTES
[1] At the time of the interview, Carlene Cox worked in Fibre's human resources department and Ron Samples worked as manager of the customer service department.
[2] But Samples testified at trial that the job description written after Hegwine's interview indicated a 60 pound lifting requirement and that he agreed with that description. Further, Samples testified that the order checker was required to lift four to six boxes a day weighing between 30 and 60 pounds.
[3] Ostrander also determined that Hegwine had a gall bladder condition requiring medical clearance. Fibre received this medical clearance and it is not relevant here.
[4] Herron testified that he faxed a completed medical clearance form to Fibre on February 23, 2001. But Ostrander testified that his office did not receive the form until March 1.
[5] The form stated that Hegwine was capable of lifting 30 pounds to her waist, and 20 pounds to shoulder height and overhead for up to two hours per day. The form also stated that Hegwine would be capable of working up to one to two weeks before her scheduled delivery date of June 16, 2001. Herron testified that these figures were not based on his knowledge of the lifting requirements for Hegwine's order checker position but that they were conservative numbers based on past experience of what would be perfectly safe for Hegwine. He further explained that he cleared only "perfectly safe" numbers at that time in order to limit liability. Report of Proceedings (Mar. 14, 2005) (RP) at 190.
[6] Bob Arkell, Fibre's Senior Vice President/Industrial Relations and General Counsel, testified that Sapp advised Hegwine that the order checker lifting requirement was 40 pounds.
[7] The evidence demonstrates that neither the doctors nor Fibre knew what the order checker position's actual lifting requirements were on March 5, 2001.
[8] Herron further testified that he would have approved "putting a [60 pound] box off a low truck onto a hand truck," the type of lifting required by the order checker position. RP at 206.
[9] Ron Samples testified that there were from four to six boxes weighing up to 60 pounds and that the process of transporting the boxes would take about 30 minutes. Similarly, Fibre customer service supervisor, Debi Manavian, testified that there were usually three or four bins and that the process took "maybe forty-five minutes," and that it took place between 7:30 A.M. and 8:00 A.M. RP (Mar. 13, 2005) at 31. Finally, Fibre order checker, Jodi Smith, testified that there could be between 5 and 15 bins, that she completed the process herself, and that the process would take about 30 to 45 minutes.
[10] Rhodes also testified that it is necessary that there be a "sedentary relief clerk" position available before an employer is required to transfer an employee to such a position due to disability. RP at 153.
[11] Hegwine's assignments of error and subsequent argument dispute findings of fact 8, 11, and a portion of finding of fact 14, in addition to all three conclusions of law.
[12] The trial court's findings of fact and conclusions of law incorrectly denote the findings as conclusions of law. We treat them as findings of fact. Finding of fact eight states:

This lifting requirement was not one that could be amended or modified. Single reports could fill an entire 60-pound bin. The Order Checker Clerk was not permitted nor qualified to break up those reports into smaller, lighter bundles. The ability to lift and carry 60 pounds was an essential element of the job.
CP at 23.
[13] Finding of fact 11 states:

The job of Order Checker Clerk could not be modified to accommodate Ms. Hegwine's temporary lifting restriction. At that time there was no other light-duty position available as a temporary assignment until the restriction had been lifted. The only possible accommodation that could have been given to Ms. Hegwine would have been to hire her as the Order Checker Clerk and then immediately place her on maternity leave. Such leave was available to company employees, as opposed to new hires.
CP at 23.
[14] Its conclusion of law number one states:

Mrs. Hegwine's lifting restriction was a "pregnancy-related condition" as that term is defined in WAC 162-30-020(2)(b). Fibre had an obligation to accommodate that temporary disability unless it caused Ms. Hegwine to be unable to perform an essential function of the job. The only accommodation available was to give her a leave of absence until her pregnancy ended and the temporary restriction ceased.
CP at 24.
[15] RCW 49.60.180 states:

It is an unfair practice for any employer:
(1) To refuse to hire any person because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a disabled person, unless based upon a bona fide occupational qualification: PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved.
(2) To discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a disabled person.
[16] RCW 49.60.120(3) authorizes the WHRC to adopt and promulgate rules and regulations to carry out WLAD's provisions, as well as policies and practices in connection therewith.
[17] Fibre's claim that it could not accommodate Hegwine's pregnancy fails even when reviewed.

Rhodes, Fibre's EEOC coordinator, testified that accommodations could reasonably be made to assist Hegwine in performing the essential lifting functions of the order checker position and that Fibre could do so without significant difficulty, disruption, or expense.
But the record demonstrates that there is insufficient evidence that Fibre took any affirmative steps to accommodate Hegwine's temporary lifting restriction or that reasonable accommodations were unavailable. Jerry Dow, Fibre's Human Resources Manager, testified that he never discussed accommodation recommendations with Rhodes and that he conducted no independent investigation of whether Washington law required Fibre to provide pregnant women with temporary accommodations. Michael Fitzpatrick, Fibre's Human Resources Director, testified that he did not discuss accommodation recommendations with Rhodes, that his discussions with Arkell consisted only of whether Hegwine could perform the essential functions of the job, given her temporary lifting restriction, and that the investigation of whether Fibre could accommodate Hegwine ended with the determination that Hegwine could not perform an essential function of the job. The only evidence supporting the trial court's finding that Fibre could not reasonably accommodate Hegwine was Arkell's bald assertion that he considered accommodations during discussions with Michael Fitzpatrick, and that they could not be made.
But in light of all the evidence, this assertion alone is insufficient to show that Fibre took any steps to address whether Hegwine could actually do the job. Indeed, Fibre's final report on Hegwine's ability to perform her job indicates that Fibre did not consider potential accommodations for Hegwine because it determined first that she was incapable, without accommodation, of performing an essential function of the job. Moreover, Arkell, Fitzpatrick, and Dow all testified that they did not discuss the accommodation recommendations Rhodes made. Finally, there was no exchange of information between Fibre and Hegwine to determine what, if any, accommodations were necessary or could be made. Reasonable accommodation envisions an information exchange between the employer and employee. Davis v. Microsoft Corp., 149 Wash.2d 521, 536, 70 P.3d 126 (2003); Goodman v. Boeing Co., 127 Wash.2d 401, 408-09, 899 P.2d 1265 (1995). The evidence here shows that Fibre made no attempt to seek or share information once it learned Hegwine was pregnant. Thus, it is clear that Fibre took no necessary affirmative steps to satisfy its obligation to avoid firing an employee solely based on pregnancy. See Davis, 149 Wash.2d at 536-37, 70 P.3d 126.
[18] It is an unfair practice for an employer to refuse to hire or terminate a woman because of pregnancy. WAC 162-30-020(3)(a).
[19] When the evidence is interpreted in Fibre's favor, at best, it establishes that, without accommodation, the order checker would lift 60 pounds only infrequently and for very brief periods of time. People who had done the job described how they did it and the varying weight of the bins the order checker lifted. But their testimony only showed that the lifting required about one minute from building to truck, that a hand truck could be used, and that the lifting was to and from the hand truck in and out of the back of the pick-up truck. The total time involved in the bin delivery was 30 to 45 minutes a day. And the evidence revealed that those doing the order checker job asked for and got help from other employees when the bins were heavy.

Essential job functions do not include marginal functions of the position. Davis, 149 Wash.2d at 533, 70 P.3d 126. But the manner of performance of a job function is not the proper focus when determining what the essential job functions are; the proper focus is the task to be performed. See Davis, 149 Wash.2d at 533, 70 P.3d 126; see also Easley v. Sea-Land Service, Inc., 99 Wash.App. 459, 994 P.2d 271 (2000). The job position was order checker. Fibre has never contended that Hegwine could not check orders.
[20] The parties disagree about whether it matters if Fibre withdrew its offer of employment to Hegwine after she started work, or whether it fired her after she began her employment because Fibre discovered that she was pregnant. Whether Fibre withdrew its offer of employment or fired Hegwine after she began working is inconsequential to our conclusion. The legal effect of Fibre's "decision to withdraw the offer of employment" was to impermissibly discriminate against Hegwine either by refusing to hire her or by terminating her employment. RCW 49.60.180; WAC 162-30-020(3)(a) and (3)(c). Fibre's decision to alter the terms of its employment offer by repeatedly changing the lifting requirements after learning of Hegwine's pregnancy on March 1, 2001 is not a legal basis to conclude either that she failed the physical examination, the only contingency Fibre specified when Cox offered her the job, or that her "availability" precluded her hiring. Applying the plain language of RCW 49.60.180 and WAC 162-30-020(3)(a), we hold that Fibre either wrongly refused to hire or wrongly terminated Hegwine's nascent employment (1) due to a lifting restriction that was not an inherent job requirement at the time of her hiring and that, should it have become an issue, was both temporary and due solely to her pregnancy; or (2) due to a conclusion unsupported by the evidence, that her "availability" was such that she could not perform the job. Thus, we conclude that Fibre violated RCW 49.60.180 and WAC 162-30-020(3)(a).

The parties also disagree on Hegwine's entitlement to maternity leave. Hegwine argues that, absent another reasonable accommodation, she was entitled to maternity leave under WAC 162-30-020(4), that states "[a]n employer shall provide a woman a leave of absence for the period of time that she is sick or temporarily disabled because of pregnancy or childbirth." Fibre responds that Hegwine was never an employee and therefore not entitled to maternity leave. Because the trial court erroneously considered the accommodation issue, we need not address the merits of this claim on appeal. The evidence here shows, however, that Fibre refused to consider any accommodation for Hegwine's pregnancy. Given the evidence that her doctor may have approved an adequate weight limitation and that other accommodations were possible, Fibre would not necessarily have been compelled to place Hegwine on maternity leave. Whether that was necessary or desirable depended on the outcome of an interactive process between Fibre and Hegwine that never occurred. The evidence on this issue is insufficient to support the trial court's finding of fact 11 that the only possible accommodation was for Fibre to place Hegwine on maternity leave.