FILED
COURT OF APPEALS
DIVISION II

2013 AUG 20 PM 12: 44

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MERIDIAN PLACE, LLC, a Washington limited liability company, | No. 42436-3-II |
| Appellant, | |
| v. | |
| JOHN AND JANE DOE HAUGHNEY, and their marital community; JAMES and KRISTI LOVEALL, and their marital community; | UNPUBLISHED OPINION |
| Respondents, | |
| HUMCOR, INC., a Washington Corporation d/b/a Callaway Fitness; PAWNEE LEASING CORPORATION, a Colorado corporation; KEY EQUIPMENT FINANCE, INC., a Michigan corporation; CASCADE BANK, a Washington corporation; SMART LENDING, LLC; and MICHAEL PETROVIC, | |
| Defendants. | |

HUNT, P.J. — Meridian Place, LLC appeals the trial court's low damages award against John Haughney under the Uniform Fraudulent Transfer Act (UFTA)[1] for Haughney's fraudulent transfer of a fitness gym to James Loveall; Meridian also appeals the trial court's refusal to enter judgment against Loveall for these damages. Meridian argues that (1) the damages award

---

[1] Chapter 19.40 RCW.

amount was too low and did not reflect the fair market value of the asset, namely the gym, as testified and agreed to by the parties at trial; (2) UFTA authorized the trial court to enter judgment against Loveall because he was the first transferee; and (3) UFTA does not impose on the defrauded party a burden to prove the damages amount. We hold that the trial court abused its discretion in setting Meridian's damages substantially below the amount the relevant evidence supports but that the trial court did not abuse its discretion in refusing to enter judgment against Loveall. Accordingly, we affirm the trial court's decision not to enter judgment against Loveall. We vacate the amount of the trial court's damages award and remand for a new hearing and recalculation of damages.

FACTS

I. FRAUDULENT TRANSFER

A. Petrovic's Opening of Callaway Fitness I and II, Owned by Humcor; Financing

Michael Petrovic started Callaway Fitness (Callaway I); in 2006, he opened a second Callaway Fitness (Callaway II). Callaway I and II were owned by Humcor, Inc., of which Petrovic was a 42 percent shareholder. John Haughney, a certified public accountant, became a Humcor shareholder in January 2007. Petrovic entrusted Humcor's business operations to Haughney, deferring to him on most business decisions, including financing and payment of outstanding debt.

In June 2006, Humcor signed a lease with Meridian, to provide a new fitness location for Callaway II, effective in February 2007, when Callaway II began operating. The monthly rent was approximately $40,000, with an additional monthly recurring payment of approximately $10,000 for improvements that Meridian undertook to accommodate Callaway II's needs. VRP

(May 23, 2011) at 56, 60, 186. Humcor used Callaway I's income to subsidize the opening and operating costs of Callaway II; but before the end of the first month of Callaway II's operation, Humcor fell behind in the rent payments. Thereafter, during the first year and a half of Callaway II's operations, Humcor's payments to Meridian were "erratic, nonexistent, [and] unpredictable." 1 Verbatim Report of Proceedings (VRP) at 62.

In addition to his shareholder and business management involvement with Humcor, Haughney was also an investor in and the managing member of Smart Lending, LLC. Additional Smart Lending investors included Haughney's family members and James Loveall, Haughney's client and friend for 18 years and occasional golf partner.

Humcor obtained and personally guaranteed a $400,000 loan from Smart Lending. Haughney also mortgaged his personal residence for approximately $635,000, which he loaned to Humcor. At this point, Humcor owed $325,000 on a preexisting equipment loan through Cascade Bank, secured by Callaway I and Callaway II assets. Thus, after the infusion of new capital from Smart Lending, Humcor's liabilities totaled approximately $1,360,000. In addition, Meridian held a landlord-lien claim against Humcor's assets[2] for two months of rent, approximately $80,000. Humcor attempted to renegotiate Callaway II's lease without success.

B. Humcor's Sale of Callaway I to Loveall; Loveall's Sale to Petrovic

In April 2008, Humcor sold Callaway I to Loveall for $114,263.54 cash, plus Loveall's assumption of Humcor's $635,736.46 mortgage obligation on Haughney's personal residence; thus, Humcor appeared to realize a total of $750,000.00 from this sale. Humcor used the cash

---

[2] Cascade Bank's security interest in Callaway II's assets was in first position, followed by Meridian, and then Smart Lending.

proceeds to pay down its debt obligation to Cascade Bank, which in turn released its security interest in Callaway I's assets.[3] Humcor's balance sheets showed that Humcor transferred to Loveall approximately $550,000.00 of Callaway I's assets (office furniture and equipment).

At the time of this Callaway I sale, Humcor was insolvent and in default on a substantial portion of Callaway II's rent. Loveall's assumption of Humcor's mortgage did not help Humcor resolve its financial problems, in part because Loveall never formally assumed the mortgage debt and never made any payments on it. By November 2008, Humcor was in bankruptcy, and Callaway II ceased to exist. At this point, Loveall told Haughney that he wanted to sell his interest in Callaway I. In 2009, Petrovic purchased Callaway I from Loveall for $1, with Petrovic assuming Loveall's remaining mortgage obligation on Haughney's home; thus, Loveall appeared to realize a total of approximately $650,000 from this sale.

## II. PROCEDURE

In July 2010, Meridian sued Humcor and Loveall under UFTA, alleging that Humcor's sale of Callaway I to Loveall had been fraudulent. Meridian sought (1) $3,049,227.48 in damages for Humcor's breach of Callaway II's lease; and (2) judgments against Humcor, Haughney, and Loveall or, alternatively, judgments against Humcor and Loveall jointly and severally, for any amounts Humcor owed Meridian. Meridian also sought to void the transfer of Callaway I to Loveall. The case proceeded to a bench trial.

At trial, Meridian, Loveall, and Haughney agreed that the $750,000 (the amount Loveall had paid to Humcor combined with the debt he had assumed in the transaction) accurately

---

[3] Cascade Bank retained its security interest in Callaway II's assets.

reflected the fair market value of Callaway I at the time of the sale. Nevertheless, Meridian argued that Loveall's assumption of Humcor's mortgage debt had been illusory and that the sale was made with intent to hinder, to delay, or to defraud Meridian. Agreeing with Meridian, the trial court found that the mortgage transfer to Loveall was illusory because (1) "[n]either Humcor nor Loveall believed that Loveall would be personally liable for that debt," and (2) the "transfer of Haughney's mortgage debt to one of [his] closest friends was not an arm's length transaction." Clerk's Papers (CP) at 340 (Findings of Fact (FF) 17).

Nevertheless, the trial court refused to enter judgment against Loveall. The trial court concluded that, even though Humcor and Loveall had both been responsible for the fraudulent transfer, "Loveall gained nothing from this sale. In fact, he lost $114,000-plus in the transaction. Therefore, there was no personal or economic gain he realized from the sale." 6 VRP at 759-60.

In setting the amount of Meridian's damages, however, the trial court concluded that (1) "[t]he lay testimony by the parties and the exhibits submitted did not support the position that Callaway [I] was worth $750,000 at the time of its sale to Loveall,"[4] (2) "*Meridian Place did not meet its burden of proof*" to establish the value of Callaway I,[5] and (3) Callaway I had a value of only $75,000, based on

> (a) the retail value of the equipment at the time of the transfer, taking into consideration that the equipment had a lien on it as well and (b) the Court's conclusion that at least $75,000 of the $114,000 paid by Loveall should have been made available for damages for breach of the lease.

---

[4] CP at 341 (FF 26).

[5] CP at 343 (Conclusion of Law 7) (emphasis added).

CP at 343 (Conclusion of Law 7). When Meridian asked how the trial court had determined

Callaway I's $75,000 value, it replied:

> *The $75,000 was a figure that I devised based on what I felt* the actual retail
> equipment worth would have been for that gym equipment at the time of the
> transfer considering also that it had a lien on it as well, just to give you some idea.
> [. . .]
>
> Also, I want counsel to understand that *I felt that the true value of the
> transfer was probably* $114,000, which was the cash that was paid. *I believe* that
> at least $75,000 of that should have been made available for damages for the
> breach of the lease, and that's the other reasoning *why I came up with the $75,000*
> as well.

6 VRP at 761-62, 764 (emphasis added). Although Meridian informed the trial court that the lien

had been paid down with the sale proceeds, the trial court did not adjust its damages ruling and

instead entered a $75,000 judgment for Meridian against Haughney.

Meridian appeals the trial court's damages award and its refusal to enter judgment against

Loveall.

## ANALYSIS

### I. UFTA AND BURDEN SHIFTING

We first address Meridian's threshold argument that the trial court erred in concluding

that Meridian bore and failed to meet the burden to prove the value of the fraudulent transfer of

Callaway I to Loveall.[6] Meridian is incorrect.

---

[6] Humcor is correct that Meridian failed to preserve this error by failing to object below to the trial court's improper placement of the burden of proof. But we have discretion to review this error by virtue of the RAP 2.5(a)'s use of the following permissive language: "The appellate court *may* refuse to review any claim of error which was not raised in the trial court." (Emphasis added). Here, we exercise our discretion to address the burden of proof because (1) this issue might otherwise arise again when we remand to the trial court to redetermine the damages amount in accordance with the UFTA; and (2) it will conserve judicial and the parties' resources to resolve the issue now.

The plain language of UFTA does not place on the defrauded party the burden of proving the *value* of the improperly transferred asset. Rather this UFTA language expressly places on the party alleging, and seeking to set aside, the fraudulent transfer the burden of proving that the debtor acted "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor" or transferred an asset "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation." RCW 19.40.041(a)(1), (2);[7] *Sedwick v. Gwinn*, 73 Wn. App. 879, 885, 873 P.2d 528 (1994). Thus, because this burden of proof involves proving that the consideration for the transfer was grossly inadequate,[8] Meridian had to establish the property's value to the extent necessary to show that the consideration provided was inadequate.

Here, however, the parties *agreed* that $750,000 was the fair market value of Callaway I at the time of the transfer. The record contains sufficient evidence to support this value. Thus, we hold that the trial court erred in (1) ruling that Meridian failed to meet its burden to prove value, and (2) using this non-existent failure in setting the amount of Meridian's damages.

## II. DAMAGES

Meridian's primary argument is that (1) the trial court erred in entering a judgment against Haughney for damages in the amount of only $75,000 where Washington's UFTA permits damages in the amount of the value of the asset transferred; and (2) for Callaway I at the

---

[7] Washington's UFTA, chapter 19.40 RCW, which regulates fraudulent transfers, provides that a fraudulent transfer occurs

> where one entity transfers an asset to another entity, with the effect of placing the asset out of the reach of a creditor, with either the intent to delay or hinder the creditor or with the effect of insolvency on the part of the transferring entity.

*Thompson v. Hanson*, 168 Wn.2d 738, 744, 239 P.3d 537 (2009).

[8] *Workman*, 50 Wn.2d at 189.

time of the transfer, the asset's value was 10 times that amount--$750,000, according to the testimonies of all parties. We agree.

A. Standard of Review

We review de novo a trial court's interpretation of a statute. *Dimension Funding, LLC v. D.K. Assocs., Inc.*, 146 Wn. App. 653, 657, 191 P.3d 923 (2008) (citing *Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 515, 910 P.2d 462 (1996)). We assume the legislature meant exactly what the statute says; if the statute is unambiguous, we will not engage in statutory interpretation. *Berger v. Sonneland*, 144 Wn.2d 91, 105, 26 P.3d 257 (2001). We review findings of fact to determine whether substantial evidence supports them, and whether the findings support the conclusions of law. *Hegwine v. Longview Fibre Co.*, 132 Wn. App. 546, 555, 132 P.3d 789 (2006), *aff'd*, 162 Wn.2d 340, 172 P.3d 688 (2007). We review the trial court's conclusions of law de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003).

We review a trial court's award of damages for an abuse of discretion. *Krivanek v. Fibreboard Corp.*, 72 Wn. App. 632, 636, 865 P.2d 527 (1993). A trial court abuses its discretion when it exercises its discretion in a manner that is manifestly unreasonable or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). A trial court abuses its discretions when its decision is outside the range of acceptable choices given the facts and the applicable legal authority. *Snoqualmie Police Ass'n v. City of Snoqualmie*, 165 Wn. App. 895, 909-10, 273 P.3d 983 (2012) (citing *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). Generally, we will reverse a damages amount only if it is outside the range of relevant evidence, shocks the

conscience, or results from passion or prejudice. *Mason v. Mortgage America, Inc.*, 114 Wn.2d 842, 850, 792 P.2d 142 (1990). Such is the case here.

## B. Value

UFTA provides the following method for calculating the damages that a creditor may recover:

> (b) [T]o the extent a transfer is voidable in an action by a creditor under RCW 19.40.071(1)(a), the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
> (1) The first transferee of the asset or the person for whose benefit the transfer was made;
>
> . . .
>
> (c) If the judgment under subsection (b) of this section is based upon the value of the asset transferred, *the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.*

RCW 19.40.081(b)(1), (c) (emphasis added). UFTA defines "asset" to include "property of a debtor, but the term does not include [p]roperty to the extent it is encumbered by a valid lien." RCW 19.40.011(2)(i).

## C. Value of Callaway I at Transfer

Loveall testified that he believed the $750,000 he paid for Callaway I reflected its fair market value at the time of the sale. In arriving at this value, Loveall took into consideration Callaway I's equipment, its membership list, and the value of its ongoing operation. Loveall's counsel similarly stated, "We know that the value of this business was $750,000. . . . The only thing that [Meridian] has suggested to us is that the assumption of the debt was somehow illusory." 5 VRP at 727-28. Haughney agreed that the $750,000 sale price accurately reflected Callaway I's fair market value. Meridian repeatedly emphasized that it did not dispute Loveall's

9

and Humcor's valuation of Callaway and that $750,000 was the "negotiated price," "a fair value for the asset," "the worth of the asset transferred,"[9] and "the value that left Humcor."[10]

Notwithstanding the parties' uncontroverted agreement that the purchase price and value of Callaway I was $750,000 when Humcor sold it to Loveall, the trial court concluded that "[w]hat the parties agree [Callaway I] was worth was the least reliable evidence. Under the facts of this case, the assumption of the Haughney mortgage debt by Mr. Loveall was illusory." 6 VRP at 759. The trial court did not explain, however, how Loveall's later failure to make Haughney's mortgage payments ("illusory" debt assumption) cast doubt on the validity of the agreed upon purchase price and the fair market value of the transferred asset at the time of the sale. Instead, the trial court appears to have "devised" its $75,000 "figure" based on (1) "what [it] felt the actual retail . . . worth would have been for that gym equipment at the time of the transfer," and (2) its "[feeling] that the true value of the transfer was probably $114,000, which was the cash that was paid . . . , at least $75,000 of [which] should have been made available for damages for the breach of the lease." 6 VRP at 761, 764.

The evidence produced at trial does not support the trial court's $75,000 figure. On the contrary, in addition to the parties' agreement about the $750,000 value, the record shows that Humcor received offers from two other fitness gyms, ranging from $200,000 to $300,000 for Callaway I's membership list alone. In addition, Humcor recorded the sale of Callaway I by adjusting its balance sheets downward by roughly $550,000 in a category marked "OFFICE

---

[9] 5 VRP at 687.

[10] 5 VRP at 691.

FURNITURE & EQUIPMENT";[11] transfer of these two assets alone totaled $650,000 to $750,000 in value. Moreover, neither the membership list value nor the furniture and equipment value reflect any value for Callaway I's ongoing operation, goodwill, or other intangibles, which arguably should have increased Callaway I's value above the $650,000 to $750,000 amounts.

We recognize that the trial court had authority under RCW 19.40.011(2)(i) and 19.40.081(c) to adjust the damages award downward in light of Cascade Bank's lien on Callaway I, which Cascade Bank released immediately after Humcor's sale of Callaway I to Loveall when Haughney paid off the underlying loan with the sale proceeds. Thus, the trial court properly considered Cascade Bank's lien in adjusting the damages award downward because UFTA does not treat encumbered property as an "[a]sset" of the fraudulent transferor (here, Haughney, as Humcor's principal shareholder). RCW 19.40.011(2)(i); *see also Thompson v. Hanson*, 142 Wn. App. 53, 66, 174 P.3d 120 (2007) ("Foreclosure, or sale of an asset for no net profit, means the asset was fully encumbered and therefore not an 'asset' for purposes of the UFTA"), *aff'd*, 168 Wn.2d 738, 239 P.3d 537 (2009). But, in lowering Callaway I's value by an amount that the record does not support, the trial court exceeded its UFTA statutory authority. A statutorily authorized downward adjustment of Meridian's damages in the amount of Cascade Bank's lien, roughly $325,000, would still have left Meridian with damages of roughly $425,000,[12] $350,000 more than the $75,000 that the trial court awarded.

---

[11] Ex. 5A, 5B.

[12] This figure represents the agreed value of the asset transferred, i.e., $750,000, less the value of the lien, $325,000.

Thus, despite the trial court's authority to adjust a damages award "as the equities may require" under RCW 19.40.081(c), here, the record does not show that "the equities [so] require"; nor did the trial court provide adequate justification for its significant departure from the values of the transferred asset and the lien, as supported by the evidence before it at trial. On the contrary, in support of its $75,000 damages award, the trial court provided only its own seemingly arbitrary "belief" that an asset's value cannot be proved by the parties' stipulation and its unsupported "feeling" that "at least $75,000 . . . should have been made available for damages for the breach of the lease." 6 VRP at 764.

We hold, therefore, that the trial court acted outside its statutory authority and thereby abused its discretion in awarding a tenth of the damages that the evidence at trial showed was compensable to Meridian under UFTA.

### III. JOINT AND SEVERAL LIABILITY

Meridian next argues that the trial court erred in refusing to enter judgment against Loveall as a party jointly and severally liable with Haughney. We disagree.

UFTA provides that "[a] judgment *may* be entered against: (1) The first transferee of the asset *or the person for whose benefit the transfer was made*." RCW 19.40.081(b) (emphasis added). Contrary to Meridian's assertion, UFTA's use of the term "may" is evidence that the trial court's decision to enter judgment against the first transferee, Loveall, is and was discretionary. *See Rudolph v. Empirical Research Sys.*, 107 Wn. App. 861, 866, 28 P.3d 813 (2001) (the words "will" and "shall" are mandatory, but words like "may" are permissive and discretionary).

No. 42436-3-II

Nevertheless, Meridian contends that the trial court erred in concluding that Loveall did not realize any personal or economic gain from the purchase of Callaway I and that he lost approximately $114,000 in the transaction; but Meridian fails to demonstrate how these factual determinations by the trial court are incorrect. CP at 340 (FF 20); Br. of Appellant at 33-34. Instead, Meridian argues that these factual determinations are "immaterial" and "afford[] no basis for exonerating Loveall." Br. of Appellant at 33-34. Meridian's argument fails: RCW 19.40.081(b) expressly authorizes the trial court to look beyond the parties' labels and to enter judgment against "the person for whose benefit the transfer was made," which it clearly did here when the trial court entered judgment against Haughney. RCW 19.40.081(b)(1).

We affirm the trial court's decision not to enter judgment against Loveall. We vacate the amount of trial court's damages award to Meridian and remand for a hearing and recalculation of the damages amount based on RCW 19.40.081 and the relevant evidence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, P.J.

We concur:

Penoyar, J.

Bjorgen, J.

13