172 P.3d 688 (2007)
Stacy L. HEGWINE, Respondent,
v.
LONGVIEW FIBRE COMPANY, INC., a Washington corporation, Petitioner.
No. 78728-O.
Supreme Court of Washington, En Banc.
Argued May 10, 2007.
Decided November 29, 2007.
*691 Nancy Williams, Kathryn C. Loring, Perkins Coie LLP, Seattle, WA, William L. Dowell, Attorney at Law, Longview, WA, for Petitioner.
Mark Stanley Brumbaugh, Walstead Mertsching PS, Longview, WA, for Respondent.
Kathleen Phair Barnard, Schwerin Campbell Barnard & Iglitzin LLP, Sarah A. Dunne, ACLU, Seattle, WA, Amicus Curiae on behalf of American Civil Liberties.
Sara Lyle Ainsworth, Northwest Women's Law Center, Seattle, WA, Amicus Curiae on behalf of Northwest Women's Law Center.
Michael Craig Subit, Frank Freed Subit & Thomas LLP, Jeffrey Lowell Needle, Seattle, WA, Amicus Curiae on behalf of Washington Employment Lawyers Assoc.
J.M. JOHNSON, J.
¶ 1 An employer who refuses to hire a job applicant because of her pregnancy is liable for sex discrimination under chapter 49.60 RCW (Washington Law Against Discrimination or WLAD), absent demonstration of a business necessity or proof of a bona fide occupational qualification.[1] Determining whether such sex discrimination has occurred involves application of the plain language of the WLAD and its related interpretive regulations.[2] These laws do not call for an accommodation analysis like that applicable to disability related employment discrimination claims; hence, no such analysis is applicable, or appropriate, in evaluating a pregnancy related employment discrimination claim. The trial court erred in applying such an accommodation analysis in the present case. The Court of Appeals correctly identified this error and, applying the proper analysis, held that petitioner Longview Fibre Company (Fibre) committed unlawful sex discrimination in refusing to hire respondent Stacy Hegwine. We affirm. Specifically, we hold that Fibre violated RCW 49.60.180(1), by refusing to hire Hegwine because of her pregnancy, and RCW 49.60.180(4), by inquiring as to Hegwine's pregnancy as part a preemployment medical examination.

FACTS AND PROCEDURAL HISTORY
¶ 2 In late 2000, Hegwine applied for a clerk/order checker position in Fibre's customer service department. The advertisement for the job stated that the company desired an applicant with related experience or education, computer abilities, and demonstrated communication skills. Ex. 1, App. A. The ad mentioned no lifting or other physical requirement. Hegwine interviewed for the position with Fibre employees Carlene Cox and Ron Samples on February 16, 2001. Fibre had no documented job description for the position at that time. During the interview, Samples told Hegwine that the position had a 25 pound lifting requirement.
¶ 3 Cox called Hegwine and offered her the position on February 21, 2001, contingent upon Hegwine's successful completion of a physical exam. Hegwine accepted the offer and was given a start date of March 1, 2001. Two days later, Hegwine completed her physical at the office of Dr. Ostrander, *692 Fibre's medical director. As part of the exam, Hegwine was required to complete a medical history form that inquired as to her pregnancy status. Ex. 18. Hegwine truthfully disclosed that she was pregnant. Id. In response, Dr. Ostrander gave Hegwine a medical release form and told her that she must have it completed by her personal physician as a condition of her employment. Ex. 8. Hegwine took this form to her physician, Dr. Herron, who completed it without being aware of any physical requirements related to Hegwine's prospective position at Fibre. Dr. Herron indicated on the form that Hegwine could lift between 20 to 30 pounds and could pull or push up to 40 pounds.[3] Ex. 1, App. D.
¶ 4 Hegwine reported for employment and orientation on March 1, 2001. After watching a series of videos and receiving documents outlining Fibre's employment policies, Hegwine met with Cox. During this meeting, Hegwine again disclosed her pregnancy. Following this disclosure, Hegwine was escorted to another employee's office, while Cox contacted Dr. Ostrander about Hegwine's physical exam. After Dr. Ostrander indicated that he had not received the medical release form back from Hegwine's physician, Cox told Hegwine that she had to leave the premises. That same day, Cox obtained the completed release form directly from Dr. Herron. Cox then contacted Hegwine and informed her that Dr. Herron had released her to lift only 20 pounds and that Fibre would be in touch.
¶ 5 Hegwine immediately contacted Dr. Herron and requested that he raise her lifting restriction to 40 pounds based on information she received from an employee at Dr. Ostrander's office as to what the actual lifting requirement was for the clerk/order checker position. Dr. Herron obliged and faxed a new form to Fibre. Ex. 1, App. E. Apparently confused by the disparity between the two releases, Dr. Ostrander contacted Dr. Herron and, based on their conversation, completed a third form. This form indicated that Hegwine could lift 20 pounds frequently and 40 pounds "occasionally to infrequently." Ex. 1, App. F.
¶ 6 After the receipt of this third form, Fibre's equal employment opportunity coordinator, Margaret Rhoades, was directed to conduct a relevant analysis of the clerk/order checker position. Rhoades analyzed the position generally and also specifically addressed whether Hegwine could perform its essential functions given her lifting restrictions. Rhoades determined that a clerk/order checker must occasionally lift boxes weighing up to 60 pounds. In her final report, Rhoades indicated that because of Hegwine's 40 pound lifting restriction, Hegwine could not meet the requirements of the clerk/order checker position. Bob Arkell, Fibre's senior vice president of industrial relations and general counsel, made the final decision to rescind Hegwine's offer. He testified that his decision was based on Hegwine's lifting restriction. On March 16, 2001, Cox called Hegwine and informed her that Fibre was "withdrawing [its] offer of employment" because her "availability" did not permit her "to perform the job." Ex. 11.
¶ 7 Hegwine sued Fibre alleging, among other things, that Fibre's actions constituted unlawful sex discrimination in violation of RCW 49.60.180. Following a bench trial, the trial court granted a judgment in favor of Fibre. Clerk's Papers (CP) at 19-20 (Judgment). The trial court grounded its decision in the law of disability discrimination, as argued by Fibre, as opposed to sex discrimination, as argued by Hegwine. CP at 14-18 (Findings of Fact and Conclusions of Law). The Court of Appeals reversed, concluding that the trial court applied the wrong legal analysis and holding that, under the proper sex discrimination analysis, Hegwine prevailed. Hegwine v. Longview Fibre Co., 132 Wash.App. 546, 550, 132 P.3d 789 (2006). The Court of Appeals remanded to the trial court solely for determination of damages. Id. at 568, 132 P.3d 789. The court also awarded Hegwine attorney fees. Id. Fibre then successfully petitioned this court for *693 review. Hegwine v. Longview Fibre Co., 159 Wash.2d 1001, 153 P.3d 195 (2007).

Analysis
I. Proper Analysis of Pregnancy Related Employment Discrimination Claims
A. Standard of Review
¶ 8 The proper legal analysis for pregnancy related employment discrimination claims under the WLAD is a question of law, which we review de novo. Dep't of Labor & Indus. v. Granger, 159 Wash.2d 752, 757, 153 P.3d 839 (2007).
B. Claims of employment discrimination because of pregnancy are to be analyzed as matters of sex discrimination and are not subject to an accommodation analysis like that utilized in the disability context
¶ 9 The trial court analyzed Hegwine's claim under a disability discrimination framework. In particular, the trial court focused its analysis on whether the 60 pound lifting requirement was an essential function of the clerk/order checker position, which Hegwine's "disability" prevented her from performing, thus relieving Fibre of any obligation to accommodate her. CP at 17-18 (Conclusions of Law). The Court of Appeals determined that this legal analysis was incorrect. Hegwine, 132 Wash.App. at 562-63, 132 P.3d 789.
¶ 10 Fibre now concedes that pregnancy is not a disability under Washington law but argues that the Court of Appeals erred in rejecting the application of an accommodation analysis analogous to that applicable to disability related employment discrimination claims. Hegwine counters that Fibre's position is inconsistent with the regulations enacted by the Washington State Human Rights Commission (WHRC or Commission), which specifically address employment discrimination because of pregnancy. We agree with Hegwine and affirm the Court of Appeals. Specifically, we hold that under the plain language of the WLAD and its interpretative regulations, pregnancy related employment discrimination claims are matters of sex discrimination. Such claims are not subject to an accommodation analysis similar to that used in the disability context.
¶ 11 While the plain language of RCW 49.60.180(1) prohibits job discrimination "because of . . . sex . . ." and does not specifically mention pregnancy, the WHRC has enacted several interpretive regulations that clarify discrimination because of pregnancy is sex discrimination. For instance, WAC 162-30-020 provides key definitions and sets forth a number of specific prohibitions on employers in regard to their conduct involving pregnant applicants and employees. Likewise, WAC 162-12-140 focuses on preemployment inquiries and, specifically, prohibits any such inquiries related to pregnancy. See WAC 162-12-140(3)(n). It is appropriate to look to these regulations in interpreting and applying RCW 49.60.180 because the WHRC is statutorily charged with interpreting and enforcing the WLAD. See Marquis v. City of Spokane, 130 Wash.2d 97, 111, 922 P.2d 43 (1996); RCW 49.60.010, .120. Moreover, so long as the Commission's interpretations do not conflict with the legislative intent underlying the WLAD, this court will often give "great weight" to those interpretations. Marquis, 130 Wash.2d at 111, 922 P.2d 43 (citing Wash. Water Power Co. v. Wash. State Human Rights Comm'n, 91 Wash.2d 62, 68-69, 586 P.2d 1149 (1978)). Like statutes, these regulations are to be interpreted and applied in accordance with their plain language to further the legislature's intent. See Mader v. Health Care Auth., 149 Wash.2d 458, 472-73, 70 P.3d 931 (2003).
¶ 12 The WHRC's relevant interpretive regulations plainly provide that claims of employment discrimination because of pregnancy are to be analyzed as matters of sex discrimination. See Kuest v. Regent Assisted Living, Inc., 111 Wash.App. 36, 42-43, 43 P.3d 23 (2002). WAC 162-30-010, which articulates the general purpose and scope of the interpretive regulations dealing with pregnancy related claims, states that "[t]his chapter interprets and implements the sex discrimination protection of RCW 49.60.180, and provides guidance regarding certain specific forms of sex discrimination." (Emphasis added.) Likewise, WAC 162-30-020, *694 which deals specifically with discrimination as to "[p]regnancy, childbirth, and pregnancy related conditions," states that its overall purpose is to explain how the general "law against discrimination in employment because of sex" is to be applied in the context of employment practices that disadvantage women because of pregnancy. WAC 162-30-020(1) (emphasis added). This same regulation clarifies that discrimination based on a pregnancy related medical condition is to be treated as a matter of sex discrimination. See WAC 162-30-020(2)(b) ("`Pregnancy related conditions' include, but are not limited to, related medical conditions, miscarriage, pregnancy termination, and the complications of pregnancy."). Thus, pregnancy related employment discrimination claims are properly treated as matters of sex discrimination, not disability discrimination, under the WLAD.[4]
¶ 13 Moreover, contrary to Fibre's assertions, neither the plain language of the WLAD nor its interpretive regulations provide for an accommodation analysis in these sex discrimination cases. Fibre first argues that an accommodation analysis is appropriate in pregnancy related cases because WAC 162-30-020(4)(a) states that "[a]n employer shall provide a woman a leave of absence for the period of time that [a woman] is sick or temporarily disabled because of pregnancy or childbirth." Pet. for Review at 9. Based on this language, Fibre argues that, at least in some circumstances, pregnancy is a disability, to be analyzed as such, under Washington law. However, this conclusion is contradicted by the plain language of WAC 162-30-010 and WAC 162-30-020(1), which specifically addresses the purpose and scope of the pregnancy related provisions of the WAC, as well as the definition of pregnancy. The single, passing use of the term "temporarily disabled" in the subsection addressing employer leave policies cannot reasonably serve to incorporate the entirely separate, otherwise inapplicable disability accommodation analysis into the analytical framework for pregnancy related sex discrimination claims. See Mader, 149 Wash.2d at 472, 70 P.3d 931 (WAC regulations are to be construed "as a whole giving effect to all of the language used . . . [and] `are to be given a rational, sensible interpretation'" (quoting Cannon v. Dep't of Licensing, 147 Wash.2d 41, 57, 50 P.3d 627 (2002))).
¶ 14 Fibre further contends that, assuming the plain language of WAC 162-30-020 does not provide for any accommodation analysis, the regulation is invalid due to its irreconcilable conflict with the plain language of RCW 49.60.180(1). RCW 49.60.180(1) provides, in relevant part:
It is an unfair practice for any employer . . . [t]o refuse to hire any person because of age, sex, martial status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability . . ., unless based upon bona fide occupational qualification:
PROVIDED, That the prohibition against discrimination because of such disability shall not apply if the particular disability prevents the proper performance of the particular worker involved.
(Emphasis added.) Fibre suggests that the final phrase in the above-quoted provision requires an accommodation analysis as to an individual employee's ability to perform his or her job is necessary in every employment discrimination case, including those covered by WAC 162-30-020. However, the statutory language plainly extends this analysis only to cases involving disability discrimination. Because neither pregnancy nor pregnancy related medical conditions are disabilities under Washington law, the language from RCW 49.60.180(1), which Fibre claims creates a conflict, is irrelevant.
¶ 15 In sum, neither the WLAD nor its interpretative regulations call for an accommodation *695 analysis in pregnancy related employment discrimination cases. Cf. WAC 162-22-025(2) (unfair practice to "[f]ail or refuse to make reasonable accommodation for an able worker with a disability"). It is not for this court to impose such an accommodation analysis where the legislature has not seen fit to do so. See Am. Cont'l Ins. Co. v. Steen, 151 Wash.2d 512, 518, 91 P.3d 864 (2004) (citing State v. Watson, 146 Wash.2d 947, 955, 51 P.3d 66 (2002)). Accordingly, we affirm the Court of Appeals' holding that an accommodation analysis like that applicable to disability related claims is not applicable to pregnancy related sex discrimination claims.[5]
II. Fibre's Alleged Violations of RCW 49.60.180
A. Standard of Review
¶ 16 A trial court's findings of fact are reviewed for substantial evidence. In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004). Substantial evidence to support a finding of fact exists where there is sufficient evidence in the record "to persuade a rational, fair-minded person of the truth of the finding." Id. A finding of fact misidentified as a conclusion of law will be treated as a finding of fact. State v. Kilburn, 151 Wash.2d 36, 52, 84 P.3d 1215 (2004). A trial court's findings of fact must justify its conclusions of law. Dumas v. Gagner, 137 Wash.2d 268, 280, 971 P.2d 17 (1999). "Questions of law and conclusions of law are reviewed de novo." Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003).
B. Fibre violated RCW 49.60.180(1) and WAC 162-30-020(3)(a)(i) when it refused to hire Hegwine because of her pregnancy
¶ 17 Hegwine contends that Fibre refused to hire her because of her pregnancy in violation of RCW 49.60.180(1) and WAC 162-30-020(3)(a)(i).[6] RCW 49.60.180(1) provides, in relevant part, that "[i]t is an unfair practice for any employer . . . [t]o refuse to hire any person because of . . . sex . . . unless based upon a bona fide occupational qualification." WAC 162-30-020(3)(a)(i) provides: "It is an unfair practice for an employer, because of pregnancy . . . to . . . [r]efuse to hire . . . a woman." The "sole exception" to this latter prohibition is business necessity. WAC 162-30-020(3)(b). Together, the plain language of these laws establishes that refusing to hire a person because of her pregnancy constitutes unlawful sex discrimination, unless the refusal is based upon a business necessity or the employer proves a valid bona fide occupational qualification (BFOQ).
*696 ¶ 18 Hegwine's claim that Fibre violated RCW 49.60.180(1), as construed by WAC 162-30-020(3)(a)(i), is a disparate treatment claim[7] based on circumstantial evidence. Disparate treatment claims based on circumstantial evidence are evaluated according to the three-step, burden-shifting protocol articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also Hill v. BCTI Income Fund-I, 144 Wash.2d 172, 180, 23 P.3d 440 (2001). First, the employee bears the burden of making a prima facie showing of discrimination. Hill, 144 Wash.2d at 181, 23 P.3d 440. If this burden is met, then a "`legally mandatory, rebuttable presumption' of discrimination temporarily takes hold, and the evidentiary burden shifts to the defendant to produce admissible evidence of a legitimate, nondiscriminatory explanation for the adverse employment action sufficient to `raise[] a genuine issue of fact as to whether [the defendant] discriminated against the plaintiff.'" Id. (citation omitted) (alterations in original) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 & n. 7, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the employer "meets this intermediate production burden, the presumption established by having the prima facie evidence is rebutted and `having fulfilled its role of forcing the defendant to come forward with some response, [the presumption] simply drops out of the picture.'" Id. at 182, 23 P.3d 440 (alteration in original) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). "Once the presumption is removed . . . the plaintiff [is] then . . . `afforded a fair opportunity to show that [defendant's] stated reason for [the adverse action] was in fact pretext.'" Id. (alterations in original) (quoting McDonnell Douglas, 411 U.S. at 804, 93 S.Ct. 1817).
¶ 19 We may assume, without deciding, that Hegwine has made a prima facie showing that Fibre refused to hire her because of her pregnancy. Fibre has conceded this point for purposes of appeal. Hegwine, 132 Wash.App. at 556, 132 P.3d 789 ("[T]he parties agree that . . . the evidence is clear that (1) [Hegwine] belongs to a protected class, (2) she suffered an adverse employment action, and (3) the adverse employment action was due to her pregnancy."). The burden then shifted to Fibre to produce a legitimate reason for the adverse employment action through demonstrating a business necessity.
1. Fibre's business necessity claim is pretextual
¶ 20 Fibre might have justified its refusal to hire Hegwine because of her pregnancy on the ground of business necessity. See WAC 162-30-020(3)(b). The term "business necessity" is not defined in the WAC or the RCW. However, this court has previously discussed the meaning of "business necessity" in the employment discrimination context. Specifically, in Shannon v. Pay `N Save Corp., 104 Wash.2d 722, 709 P.2d 799 (1985), this court held that "to establish a business necessity defense an employer must prove . . . that the [challenged employment practice] utilized . . . significantly correlates with the fundamental requirements of job performance." Id. at 731, 709 P.2d 799.[8] Further guidance as to the proper application of the business necessity defense is provided by the text of the regulation. In particular, WAC 162-30-020(3)(b) includes the following example of business necessity: "[A]n employer hiring workers into a training program that cannot accommodate absences for the first two months might be justified in refusing to hire *697 a pregnant woman whose delivery date would occur during those first two months."
¶ 21 The Court of Appeals erroneously concluded that business necessity, under WAC 162-30-020(3)(b), is an affirmative defense of which the employer bears both the burden of production and the burden of persuasion. Hegwine, 132 Wash.App. at 566, 132 P.3d 789 (citing CR 8(c)). The characterization of the business necessity justification as an affirmative defense conflicts with the analysis applicable to disparate treatment claims and the McDonnell Douglas burden-shifting scheme. It also conflicts with this court's decision in Kastanis v. Education Employees Credit Union, 122 Wash.2d 483, 859 P.2d 26, 865 P.2d 507 (1993). In Kastanis, we specifically rejected that the contention that an employer's claim of a business necessity in a disparate treatment case was an affirmative defense, reasoning that "[s]ince the ultimate burden of proving discrimination rests with the plaintiff . . . the burden of proof on the issue of business necessity also rests with the plaintiff." Id. at 492, 859 P.2d 26. Although the burden of production shifts to the employer to produce evidence of a business necessity, the burden of persuasion always remains with the employee to show intentional discrimination.
¶ 22 Fibre met its intermediate burden of production by asserting that its decision to withdraw its offer of employment was based on Hegwine's inability to meet an essential function of the position she applied for, i.e., a weight-lifting requirement. The presumption that arose from prima facie evidence was thus rebutted, and dropped from the case. The ultimate burden was on Hegwine to show that the proffered weight-lifting requirement was pretextual and that Fibre intentionally discriminated against her because of her pregnancy. Hegwine succeeded in meeting her burden. As the Court of Appeals explained:
[T]he record contains evidence sufficient to show that [Fibre's facially discriminatory reason for not hiring Ms. Hegwine] was a pretext to avoid hiring a pregnant woman: (1) the job advertisement listed no lifting requirements; (2) in the interview only 25 pounds was mentioned as a lifting requirement; (3) Hegwine never suggested any pregnancy related limitations to Fibre or its doctor; (4) when Fibre learned Hegwine was pregnant through its mandatory physical, it immediately assumed she had restrictions that her doctor would have to identify; (5) when Hegwine's doctor's permission exceeded the 25 pound lifting requirement, Fibre changed the requirement and told her it was 40 pounds; (6) when Hegwine's doctor submitted a second form responding to the new 40 pound lifting requirement, Fibre's doctor talked to Hegwine's doctor and obtained a third form, still allowing lifting adequate to do the job as explained by Fibre; (7) Fibre then told Hegwine to leave its premises and not return until the alleged situation all sorted out; (8) only after Hegwine was removed did Fibre undertake a job analysis that resulted in an even greater lifting requirement  60 pounds; (9) Fibre did not communicate this new requirement to either Hegwine or her doctor; (10) instead, it told Hegwine that her "availability" precluded her from performing the job and therefore "rescinded" her job offer; and finally (11) Fibre altered its position and argued at trial that it rescinded its offer, not because of Hegwine's "availability," but because she could allegedly not perform an essential function of the job that was determined after it rescinded its offer.
Hegwine, 132 Wash.App. at 565-66, 132 P.3d 789. Reasonable minds could not differ given this evidence, and therefore, as a matter of law, Hegwine established that Fibre's claim of business necessity was pretextual.
¶ 23 Because Hegwine established that Fibre's business necessity claim was clearly pretextual, we hold that Hegwine has proved sex discrimination in violation of RCW 49.60.180(1) and WAC 162-30-020(3)(a)(i), as a matter of law.
2. Fibre failed to show its refusal to hire Hegwine was based on a valid BFOQ
¶ 24 A legal defense for refusal to hire Hegwine based on her pregnancy would exist if not being pregnant were a valid BFOQ for the clerk/order checker position. *698 See RCW 49.60.180(1). WAC 162-16-240 is the primary interpretive regulation dealing with BFOQs in the context of employment discrimination claims. It provides that:
Under the law against discrimination, there is an exception to the rule that an employer . . . may not discriminate on the basis of protected status; that is if a bona fide occupational qualification (BFOQ) applies. The commission believes that the BFOQ exception should be applied narrowly to jobs for which a particular quality of protected status will be essential to or will contribute to the accomplishment of the purposes of the job.

WAC 162-16-240 (emphasis added). This regulation indicates that to establish a valid BFOQ, an employer must show that excluding members of a particular protected status group is "essential to . . . the purposes of the job." Id. This court articulated a similar standard in Franklin County Sheriff's Office v. Sellers, 97 Wash.2d 317, 646 P.2d 113 (1982). Specifically, in that case, this court indicated that the correct BFOQ standard requires an employer to establish that "all or substantially all persons in the excluded class would be unable to efficiently perform the duties [of the position at issue], and the essence of the operation would be undermined by hiring anyone in that excluded class." Id. at 326, 646 P.2d 113 (internal citation omitted). Thus, to succeed with a BFOQ defense here, Fibre must have introduced sufficient evidence to establish that excluding pregnant women was "essential to . . . the purposes of" the clerk/order checker position, WAC 162-16-240, or that "all or substantially all" pregnant women "would be unable to efficiently perform the duties" of the position, such that hiring them would undermine Fibre's operations. Id.
¶ 25 Fibre has not met this burden; indeed, Fibre offered no evidence that excluding pregnant women was essential to the clerk/order checker position or that substantially all pregnant women are incapable of meeting the position's lifting requirement. Cf. Blanchette v. Spokane County Fire Prot. Dist. No. 1, 67 Wash.App. 499, 836 P.2d 858 (1992) (indicating that even documented medical standards developed as guidelines for determining fitness for fire fighter duty are insufficient to establish a valid BFOQ). Thus, Fibre cannot succeed with a BFOQ defense.
C. Fibre violated RCW 49.60.180(4) and WAC 162-12-140(3)(n), when it inquired as to Hegwine's pregnancy status as part of its hiring process
¶ 26 Hegwine contends that Fibre also violated the WLAD when it required her to disclose her pregnancy as part of a mandatory preemployment medical exam. Fibre contends that its inquiry was permissible. The trial court did not find Fibre's action unlawful. The Court of Appeals reversed, concluding that Fibre violated RCW 49.60.180, as construed by WAC 162-12-140(3)(n), when it inquired into Hegwine's pregnancy status. Hegwine, 132 Wash.App. at 563-64, 132 P.3d 789. We also affirm this holding.
¶ 27 RCW 49.60.180(4) provides, in relevant part, that "[i]t is an unfair practice for any employer . . . to make any inquiry in connection with prospective employment, which expresses any limitation, specification, or discrimination as to . . . sex . . . or any intent to make any such limitation, specification, or discrimination, unless based upon a bona fide occupational qualification." WAC 162-12-140(3)(n) provides that "[a]ll questions as to pregnancy, and medical history concerning pregnancy and related matters" are prohibited as "unfair preemployment inquiries." Together, these laws establish that inquiring as to a prospective employee's pregnancy status constitutes unlawful sex discrimination, unless the inquiry is based upon a valid BFOQ.
¶ 28 Hegwine's claim that Fibre violated RCW 49.60.180(4) is supported by direct, as opposed to circumstantial, evidence. Hence, her second claim is not to be analyzed under the three-step protocol from McDonnell Douglas, 411 U.S. 792, 93 S.Ct. 1817. Instead, the applicable standard provides that Hegwine need prove only that "discriminatory animus was a substantial factor in the decision at issue, after which the burden of persuasion shifts" to Fibre. Griffith v. Schnitzer Steel Indus., 128 Wash.App. 438, *699 446 n. 4, 115 P.3d 1065 (2005), review denied, 156 Wash.2d 1027, 133 P.3d 473 (2006). Fibre must then prove "that it would have taken the same action regardless of discriminatory animus." Id. at n. 4.
¶ 29 Hegwine has established the following relevant facts by direct evidence: In February 2001, Fibre made a conditional offer of employment to Hegwine. The primary condition imposed on the offer was that Hegwine undergo an exam by a company physician. As part of this exam, Fibre's physician, Dr. Ostrander, required Hegwine to complete a medical history form, which included the question whether Hegwine was pregnant. At the time Hegwine was required to complete this form, Dr. Ostrander did not know what job Hegwine was applying for or what, if any, physical requirements attached to that job. 1 Verbatim Report of Proceedings (VRP) (Mar. 15, 2005) at 47, 61, 65-66. Hegwine had not expressed any health concerns or limitations associated with her pregnancy. Believing that full, truthful disclosure was necessary to ensure her employment, Hegwine revealed her pregnancy.
¶ 30 Whether the above facts establish a violation of WAC 162-12-140(3)(n) hinges on whether the medical exam was a preemployment or postemployment inquiry, as that regulation's prohibition does not apply after a person is employed. WAC 162-12-140(1). We conclude that Hegwine's exam was properly characterized as preemployment in light of the fact that Fibre itself has consistently argued, since trial, that Hegwine was never its employee. See 2 VRP (Mar. 15, 2005) at 183-85, 210; see also CP at 9 ("Fibre denies that Plaintiff was employed by Fibre."). The trial court also found that "Ms. Hegwine was not an employee when all this happened." 2 VRP (Mar. 15, 2005) at 291. That Ms. Hegwine's exam is properly characterized as a preemployment inquiry is also supported by case law. See, e.g., Eelbode v. Chec Med. Ctrs., Inc., 97 Wash.App. 462, 984 P.2d 436 (1999); McLean v. St. Regis Paper Co., 6 Wash.App. 727, 496 P.2d 571 (1972).
¶ 31 Because this exam was required preemployment, Fibre's inquiry as to Hegwine's pregnancy violated RCW 49.60.180(4), as construed by WAC 162-12-140(3)(n). Based on this violation, we conclude that Hegwine has established that discriminatory animus was a substantial factor motivating Fibre in its employment actions. United States Supreme Court precedent confirms that even alleged health or safety concerns of the employer, as to Hegwine or her fetus, are insufficient to rebut this proof of discriminatory animus. See Johnson Controls, 499 U.S. 187, 111 S.Ct. 1196.
¶ 32 To successfully defend its actions, Fibre must prove its inquiry was based upon a valid BFOQ. See WAC 162-12-140(2)(a). To succeed with a BFOQ defense here, Fibre would have to establish that inquiring as to pregnancy was "essential to . . . the purposes of" all of its positions, WAC 162-16-240, or that "all or substantially all" pregnant women are incapable of performing any job at Fibre efficiently, such that the essence of Fibre's operations would be undermined by not conducting its discriminatory inquiry. Sellers, 97 Wash.2d at 326, 646 P.2d 113. Fibre introduced no objective, medical evidence on this point. The only plausibly relevant testimony came from Dr. Ostrander, who indicated that general safety concerns motivate Fibre's medical examinations. 1 VRP (Mar. 15, 2005) at 55. This is insufficient evidence to establish a valid BFOQ. Accordingly, we affirm the Court of Appeals decision that Fibre also violated RCW 49.60.180 as construed by WAC 162-12-140.
III. Hegwine's Entitlement to Attorney Fees
¶ 33 RCW 49.60.030(2) provides that "[a]ny person deeming himself or herself injured by any act in violation of [the WLAD] . . . shall have a civil action in a court of competent jurisdiction . . . to recover the actual damages sustained by the person . . . together with the cost of suit including reasonable attorneys' fees." Here, as in the Court of Appeals, Hegwine has properly requested such fees in accordance with RAP 18.1. As noted by the Court of Appeals, although "RCW 49.60.030(2) does not specifically authorize an award . . . it has been interpreted by [this court] as granting prevailing parties attorney fees and expenses on *700 appeal." Hegwine, 132 Wash.App. at 568, 132 P.3d 789 (citing Allison v. Hous. Auth. of Seattle, 118 Wash.2d 79, 98, 821 P.2d 34 (1991)). In accordance with our conclusion that Hegwine prevails on the merits of her claims under the WLAD, we hold that Hegwine is entitled to attorney fees.

CONCLUSION
¶ 34 The Court of Appeals correctly determined that Hegwine's pregnancy related employment discrimination claim was a matter of sex discrimination that was not subject to an accommodation analysis like that applicable to disability related claims. The Court of Appeals also correctly determined that Fibre violated RCW 49.60.180 by refusing to hire Hegwine because of her pregnancy and by impermissibly inquiring into Hegwine's pregnancy status. Thus, we affirm the decision of the Court of Appeals, which reversed the trial court, and remand for determination of damages. In addition, we hold that Hegwine is entitled to attorney fees.
WE CONCUR: GERRY L. ALEXANDER, Chief Justice, TOM CHAMBERS, SUSAN OWENS, RICHARD B. SANDERS and BOBBE J. BRIDGE, Justices.
MADSEN, J. (concurring).
¶ 35 Although I agree with the result reached by the majority, I write separately to point out that the majority mistakenly characterizes a number of administrative rules as interpretations of the antidiscrimination statutes, when they were, in fact, promulgated pursuant to delegated legislative authority and stand as substantive law.

Analysis
¶ 36 Under RCW 49.60.180(1) and (2), it is an unfair labor practice for an employer to refuse to hire or to discharge any person from employment on the basis of sex. The legislature authorized the Washington State Human Rights Commission (the commission) to adopt rules to carry out the provisions of Washington's Law Against Discrimination, chapter 49.60 RCW. RCW 49.60.120(3). Pursuant to this grant of legislative authority, the commission adopted WAC 162-30-020, which provides that discrimination because of pregnancy is a form of sex discrimination and states that the rule "explains how the law applies to employment practices that disadvantage women because of pregnancy or childbirth." WAC 162-30-020(1). The rule states that "[i]t is an unfair practice for an employer, because of pregnancy or childbirth, to . . . [r]efuse to hire or . . . terminate . . . a woman." WAC 162-30-020(3)(a)(i). The rule also states that the "sole exception" is "if an employer can demonstrate business necessity for the employment action." WAC 162-30-020(3)(b).
¶ 37 The majority erroneously treats the rule adopted by the commission as only an interpretation of the discrimination statutes. The rule is more, however. WAC 162-30-010 states that chapter 162-30 WAC "interprets and implements the sex discrimination protection of RCW 49.60.180, and provides guidance regarding certain specific forms of sex discrimination." (Emphasis added.) Thus, RCW 49.60.180(1) and (2) make it an unfair labor practice to discriminate in hiring and firing on the basis of sex, and WAC 162-30-020 expressly provides that discrimination on the basis of pregnancy is sex discrimination under the statute, defines relevant terms, states specifically what constitutes unfair practices because of pregnancy, and provides guidance for leave policies and employee benefits with regard to pregnancy.
¶ 38 The majority focuses on the word "interprets" in WAC 162-30-010. But this rule also says that chapter 162-30 WAC "implements" the sex discrimination protection of RCW 49.60.180. By its terms, the rule thus states that it does more than interpret. This is in accord with RCW 49.60.120(3), which grants authority to the commission "[t]o adopt, amend, and rescind suitable rules to carry out the provisions of this chapter, and the policies and practices of the commission in connection therewith." This authority encompasses more than merely interpreting the statutes. As this court recognized in Washington Water Power Co. v. Washington State Human Rights Comm'n, 91 Wash.2d 62, 69, 586 P.2d 1149 (1978):

*701 The fact that the commission was given broad policy formulation and rule making powers indicates a legislative recognition that all of the circumstances in which discrimination might exist and all of the forms which it might take were not then known and could not be anticipated, and that the diligence and expertise of an administrative agency were needed to achieve the purpose intended in the statute.
¶ 39 In stating that pregnancy discrimination is sex discrimination, and that pregnancy, the potential to become pregnant, and pregnancy related conditions are all encompassed within the term "pregnancy," WAC 162-30-020 is more than just interpretive. It provides substantive terms that when given effect mean that an employer who discriminates on the basis of pregnancy violates RCW 49.60.180. The rule also substantively provides that if the employment action is for a legitimate business necessity, no sex discrimination occurs. Ironically, while insisting that the rule is merely interpretive, the majority in fact gives it substantive effect. Majority at 10-12.
¶ 40 I have no quarrel with the conclusion that the commission's rules may also be interpretive and therefore helpful in questions of statutory construction where a statute is ambiguous. But I do not agree that WAC 162-30-020 is merely interpretive.
¶ 41 While the majority's mischaracterization of the administrative rule as merely interpretive in this case does not alter the result, in future cases the error could have serious consequences. The principles that apply to an appellate court's review of an agency's interpretation of a statute are markedly different from the principles that apply to rules promulgated under an agency's delegated legislative power. Compare, e.g., Bostain v. Food Express, Inc., 159 Wash.2d 700, 713-17, 153 P.3d 846 (2007) (discussing principles applying to an agency's interpretive rules) and Edelman v. State ex rel. Pub. Disclosure Comm'n, 152 Wash.2d 584, 99 P.3d 386 (2004) (same), with, e.g., Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 892-96, 83 P.3d 999 (2004) (discussing principles that apply to an agency's rule promulgated pursuant to a delegation of legislative authority) and Fahn v. Cowlitz County, 93 Wash.2d 368, 610 P.2d 857 (1980) (same); see generally Ass'n of Wash. Bus. v. Dep't of Revenue, 155 Wash.2d 430, 120 P.3d 46 (2005) (discussing differences between rules promulgated under delegated legislative authority, which have the force of law, and an agency's interpretative rules). Unless the agency exceeds its delegated authority or acts in contravention of constitutional restrictions, an appellate court must apply the same construction rules to an agency's rule promulgated pursuant to a grant of legislative authority as to a statute enacted by the legislature. Rules regarding an agency's interpretation of statutes are not as deferential.
¶ 42 I concur in the result reached by the majority.
WE CONCUR: CHARLES W. JOHNSON and MARY E. FAIRHURST, Justices.
NOTES
[1] RCW 49.60.180(1); WAC 162-30-020.
[2] Although Justice Madsen in her concurrence characterizes the rules adopted by the Washington State Human Rights Commission as legislative rules promulgated under the agency's delegated legislative power not as interpretative rules (concurrence (Madsen, J.) at 3-4), I disagree. WAC 162-30-010 states that chapter 162-30 WAC "interprets" and "implements the sex discrimination protection of RCW 49.60.180." (Emphasis added.) Additionally, in Marquis v. City of Spokane, 130 Wash.2d 97, 922 P.2d 43 (1996), we stated in reference to the same rules: "In addition to the language of the statute itself, we may also look to the Human Rights Commission's interpretation of the law as an aid in construing RCW 49.60. A court must give great weight to the statute's interpretation by the agency which is charged with its administration, absent a compelling indication that such interpretation conflicts with the legislative intent." Id. at 111, 922 P.2d 43 (emphasis added) (citing Wash. Water Power Co. v. Wash. State Human Rights Comm'n, 91 Wash.2d 62, 68-69, 586 P.2d 1149 (1978)).
[3] Dr. Herron testified that these were conservative numbers based on past experience of what would be "perfectly safe," explaining that he cleared only "perfectly safe" numbers to limit liability. 2 Verbatim Report of Proceedings (VRP) (Mar. 14, 2005) at 189-90.
[4] Discrimination on the basis of pregnancy is similarly treated as a form of sex discrimination under federal law. See Pregnancy Discrimination Act of 1978, Pub.L. No. 95-555, 92 Stat. 2076 (adding subsection (k) to 42 U.S.C. § 2000e), discussed at length by the United States Supreme Court in International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Johnson Controls, Inc., 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991).
[5] Fibre suggests that our holding will necessarily result in either (1) pregnant employees being forced to perform their job responsibilities despite physical limitations related to pregnancy or (2) employers being forced to hire pregnant applicants who cannot perform essential functions of the jobs applied for. As to the first contention, the decision that no accommodation analysis is to be applied by a court in evaluating a pregnancy related employment discrimination claim in no way mandates, or supports, employers forcing pregnant employees to perform jobs beyond their physical capabilities. Should an employer hire a pregnant employee, that employee is to receive the same treatment as any other employee with similar physical limitations. See WAC 162-30-020(3)(a)(ii) (unfair practice to impose different terms and conditions of employment because of pregnancy). As to the second contention, our holding does not require employers to hire pregnant applicants who cannot perform essential job functions. The plain language of RCW 49.60.180(1) confirms that an employer may not hire a pregnant woman if this decision is supported by a bona fide occupational qualification (BFOQ). But see Johnson Controls, 499 U.S. at 204, 111 S.Ct. 1196 (sex or pregnancy cannot support valid BFOQ unless status "actually interferes with the employee's ability to perform the job," as opposed to merely posing a safety or liability concern). Additionally, WAC 162-30-020(3)(b) provides that refusing to hire a woman because of pregnancy is permissible upon a showing of business necessity.
[6] As noted by the Court of Appeals, the parties dispute whether Hegwine was rejected as a job applicant or hired, then fired by Fibre. However, this issue is, essentially, irrelevant since RCW 49.60.180 applies in the same manner to refusal to hire and dismissal cases. Hegwine, 132 Wash. App. at 567 n. 20, 132 P.3d 789; see also RCW 49.60.180(1)-(2). We refer to Fibre's action as refusal to hire in light of the trial court's oral finding that "Ms. Hegwine was not an employee when all this happened." 2 VRP (Mar. 15, 2005) at 291.
[7] "`"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic].'" Raytheon Co. v. Hernandez, 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (alterations in original) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Liability in a disparate-treatment case "`depends on whether the protected trait . . . actually motivated the employer's decision.'" Id. (alteration in original) (quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).
[8] Although Shannon defines "business necessity" in conjunction with a disparate impact claim, the basic definition of business necessity can also be applied to disparate treatment claims, albeit with a different burden of proof allocation.