# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JAMES VORHIES, | No. 48622-9-II |
| Respondent, | |
| v. | |
| DEPARTMENT OF RETIREMENT SYSTEMS OF THE STATE OF WASHINGTON, | PUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — The Department of Retirement Systems (DRS) appeals the superior court's reversal of DRS's final order which denied James Vorhies's claim for catastrophic disability retirement benefits. It also appeals the superior court's award of attorney fees and costs.

We conclude that DRS did not erroneously decline to apply workers' compensation law in its determination, apply an incorrect standard of proof, decline to consider headaches, and require Vorhies to show that prospective employers would not provide workplace accommodations for his disability. Because Vorhies is not the prevailing party in this appeal, we decline to award attorney fees. We affirm DRS's final order and, therefore, reverse the superior court.

## FACTS

In 2004, the City of Sequim hired Vorhies as a full-time law enforcement officer. Vorhies became a member of the Washington State Law Enforcement Officers' and Firefighters' Retirement System (LEOFF) Plan 2. After suffering injuries during officer training and while on

duty, and undergoing two surgeries to relieve pain, Vorhies resigned as a law enforcement officer from the City of Sequim in December 2010.

Vorhies applied for workers' compensation benefits. The Department of Labor and Industries (L&I) accepted his claim for medical care and time loss for lumbar (back) strain and later closed his claim. In January 2011, Vorhies applied for Social Security Disability (SSD) benefits. The Social Security Administration (SSA) denied his application, denied it on reconsideration, and denied it again after a hearing on appeal.

In February 2011, Vorhies applied to DRS for disability retirement. DRS accepted Vorhies's cervical spine (neck) injury as the basis for his application and approved his eligibility for line-of-duty or "duty" disability retirement benefits, effective retroactive to January 1, 2011. Administrative Record (AR) at 8. DRS denied his application for the enhanced benefit of total line-of-duty or "catastrophic" disability benefits. AR at 2.

DRS reconsidered Vorhies's application for catastrophic disability benefits, but denied it. Vorhies petitioned DRS for administrative review of the denial, and in October 2012, his application was again denied. He subsequently filed a notice of appeal to DRS.

During a three-day hearing, Vorhies; two vocational experts, Karin Larson and Barbara Berndt; and Vorhies's primary care physician, Dr. Michael Crim, testified. In February 2015, DRS entered a final order denying Vorhies catastrophic disability retirement benefits. The findings of fact in the final order are summarized as follows.

Vorhies earned his GED (General Educational Development) in California and worked for a period of time as a laborer in residential construction. He started his own subcontracting painting business. Upon moving to Washington, he and his father started their own successful painting

business.  Vorhies learned to use a software program to manage the bookkeeping.  Also, he restored cars and motorcycles as a hobby.

When the painting business was slow, Vorhies drove trucks used for refueling and refilling pesticide tanks for helicopters.  Vorhies taught himself how to repair and maintain helicopter engines and rotor blades.  He also learned basic flying skills.  Vorhies always had an aptitude for "figuring [things] out."  AR at 4.  In addition to running a painting business, Vorhies and his father became licensed nuisance wildlife control operators and trapped animals as a paid service.  Vorhies developed two new types of traps and applied for patents.  He sold his rights to one of the traps while the patent was pending.  The patent for the second trap was still pending at the time of the DRS hearing.

In 2004, Crim conducted a medical exam on Vorhies and assessed him as being in "really good shape."  AR at 5.  Two years later, Vorhies saw Crim for neck and arm pain which Vorhies traced back to an unreported injury during basic law enforcement training.  Vorhies developed radiculopathy and, in 2008, had an anterior cervical discectomy and a spinal fusion.

Later in 2008, Vorhies had a car accident while on duty.  He reported to Crim that he continued to have moderate to severe neck pain that interfered with his sleep.  However, a post-operative exam showed progress with the cervical fusion and showed no signs of damage to the fusion site.  Vorhies took pain medication as needed, received massage therapy, and anticipated starting physical therapy.

Vorhies continued to experience neck pain.  In 2009, he received steroid injections, and ultimately underwent a second neck surgery.  Vorhies returned to work, but on light duty.  In September 2010, Vorhies's neck pain worsened and he took extended medical leave.  Crim would not approve Vorhies's return to law enforcement duty and another physician from whom Vorhies

3

sought a second opinion agreed. Crim notified the City of Sequim that Vorhies's condition appeared to be a permanent disability, and Vorhies could not be released back to work without extreme restrictions due to the condition of his spine. Vorhies resigned from the police force approximately one month later.

As part of Vorhies's application for LEOFF disability retirement, Crim submitted a medical report to DRS, and in a progress note, opined that Vorhies was "100% disabled from his current job" and that changing jobs due to his neck injury and ongoing pain issues was the best alternative. AR at 8. While DRS approved Vorhies's application for LEOFF line-of-duty disability, it stated that Vorhies was "not disabled for all employment, but only for continued employment as a police officer." AR at 8. DRS denied catastrophic disability benefits.

In 2011, Crim opined in another progress note that a formal psychological evaluation conducted on Vorhies confirmed the "absence of any untoward psychopathology." AR at 9. Vorhies received a physical capacities evaluation (PCE)[1] in 2011 and again in 2013. The two evaluations did not differ greatly. The 2011 report noted that sometime after the evaluation, Vorhies described having a severe migraine headache which increased his neck pain and affected his sleep. Crim provided no testimony regarding headaches.

According to the PCEs, Vorhies was able to alternately sit, stand, and walk 6.5-7.5 hours for 3 hours at a time; alternately stand and walk 30 minutes at a time for up to 2.5 hours; walk 20 minutes at a time for up to 1.3 hours intermittently; stand 15 minutes at a time for up to 1.5 hours intermittently; and sit 1.5 hours at a time for up to 5 hours intermittently. He could kneel occasionally, crouch frequently, bend or stoop, climb stairs and turn his back, but he could seldom turn his neck. Based on the results of the PCEs, Vorhies could not perform a full range of light

---

[1] The PCEs measured Vorhies's activity tolerance and his ability to perform basic activities.

duties, but was expected to perform light duties at somewhat reduced levels. Crim also believed Vorhies could perform some type of "very limited" work. AR at 12.

At the time of the hearing, Vorhies could do light housekeeping and take care of himself without assistance. He watched television most of his waking hours, and walked once or twice a short distance to his parents' house. He could drive and mow the lawn, though he could only drive the lawnmower one hour per day. Vorhies could type slowly, send e-mails, search the Internet, and use Microsoft Word and Excel. Vorhies had confidence he could learn to use computer programs if he had time to study the instructions. Vorhies had no trouble following instruction, but doubted his ability to multitask.

Also at the time of the hearing, Vorhies had not looked for any paid employment since his retirement. He believed he could not be employed because his work experience involved jobs requiring physical labor and no workplace would accept the pace at which he worked. Vorhies took five prescribed medications for nerve pain, blood pressure, and sleep. His neck and shoulder pain interfered with his sleep, and when the pain radiated into his neck after extended activity, he had headaches. He perceived his pain symptoms to be worsening.

Neither Larson nor Berndt had previously worked with LEOFF disability retirement benefits. Larson opined that Vorhies would not be able to obtain competitive gainful employment in the Sequim-Port Angeles area because of his physical restrictions and limited transferable skills obtained from his work experience. She did not identify jobs in the labor market that Vorhies could obtain; instead, she testified to a number of jobs he could not obtain. Larson testified that Vorhies could not compete in the labor market and could not obtain and maintain either full- or part-time employment. She also opined that Vorhies could not earn pay of $1,040 per month or

more—the minimum monthly earnings to disqualify him from receiving LEOFF catastrophic disability benefits.[2]

Berndt opined that Vorhies had transferrable skills and abilities that could be applied to a list of occupations she researched using the Department of Employment Security's database. She did not independently consider the effects of Vorhies's reported pain, but stated that she would take into account a medical judgment that pain interfered with Vorhies's ability to work. She explained that pain was not quantifiable and that an assessment of the pain would determine whether a person could work. The assessment would also determine whether treatment could assist the person.

Berndt further opined that Vorhies's varied work history and skills demonstrated that he was a "creative individual who can reinvent himself into various occupations." AR at 22. Although she could not distinguish the listed occupations between full-time and part-time work, she said that based on the medical opinions, Vorhies could resume full-time work or near full-time work. She acknowledged that Vorhies had limitations, but that he was not "totally work-disabled" for light or sedentary occupations, and that he possessed the skills and physical abilities to earn the threshold earning capacity. AR at 19.

Berndt stated that jobs that met Vorhies's physical abilities existed in Vorhies's labor market and were generally available if he was willing to search for them. The jobs she identified would produce monthly earnings of at least $1,040 per month, at 15-30 work hours per week, depending on the rate of compensation.

---

[2] WAC 415-104-482(1)(c), (13)(d).

The conclusions of law in the final order stated, in relevant part:

11 . . . Appellant . . . urg[es] [DRS] to interpret and apply RCW 41.26.470(9) and WAC 415-104-482 by reference to the law of workers' compensation. This approach is not adopted here because it is not supported by these statute[s] and agency rule provisions governing the LEOFF Plan 2 catastrophic disability benefit.

. . . .

53 . . . Alternately walking, standing and sitting, he has the physical capacity to engage in income-producing activity for less than five hours a day in a standard five-day work week, the most that would be required at the lowest wage. . . . [H]e is equipped to learn and perform the tasks generally expected within these [jobs] by virtue of his varied transferable skills. [His] transferable skills make it quite plausible that he could earn compensation greater than $10.18 per hour, in which case fewer hours of work would be needed to reach the threshold.

. . . .

55 . . . This confusion was most apparent where Ms. Larson opined on Mr. Vorhies' ability to be "competitive" in his labor market, or to "obtain" competitive employment. . . . The test . . . is not whether an applicant can obtain any specific kind of work, only whether he can engage in some kinds of work that are available in his labor market.

. . . .

58 . . . Berndt's report and testimony are given greater credit as the undersigned finds them more appropriate to the catastrophic disability rule and more reliable.

AR at 27, 44-46.

Vorhies filed a petition for review of DRS's final order with Thurston County Superior Court. The superior court entered a written order, reversing DRS's final order.

The superior court also awarded Vorhies attorney fees and costs. The court stated that it considered the parties' arguments from a legal standpoint and believed Vorhies argued a "good faith position . . . consistent[ly] throughout." RP (Feb. 19, 2016) at 8.

DRS appeals the superior court's order.

ANALYSIS

I.      Standard of Review

We review a final agency order under RCW 34.05.570(3). In reviewing an administrative action, we sit in the same position as the trial court and apply the Administrative Procedure Act (APA) standards directly to the agency's administrative record. *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The party challenging an agency's action must prove the decision's invalidity, and our review is limited to the record before the agency. *Tucker v. Dep't of Ret. Sys.*, 127 Wn. App. 700, 705, 113 P.3d 4 (2005); RCW 34.05.570(1)(a), .558. Relief may be granted based on an agency's erroneous interpretation or application of the law. RCW 34.05.570(3)(d).

We review a challenge to an agency's statutory interpretation and legal conclusions de novo. *Tucker*, 127 Wn. App. at 705. We give "great weight to an agency's interpretation of the laws it administers, and an agency charged with the administration and enforcement of a statute may interpret ambiguities within the statutory language through the rule making process." *Shaw v. Dep't of Ret. Sys.*, 193 Wn. App. 122, 133, 371 P.3d 106 (2016). Although we give substantial weight to an agency's interpretation of the law it administers, the agency's interpretation is not binding. *City of Pasco v. Dep't of Ret. Sys.*, 110 Wn. App. 582, 587, 42 P.3d 992 (2002).

We evaluate a statute's plain language to determine legislative intent. *Tucker*, 127 Wn. App. at 705. We examine the statute as a whole and our statutory interpretation must not create an absurd result. *Tucker*, 127 Wn. App. at 705-06. Given the remedial nature of pension statutes, we liberally construe statutory ambiguities in favor of the intended beneficiary. *Morrison v. Dep't of Ret. Sys.*, 67 Wn. App. 419, 427, 835 P.2d 1044 (1992).

II.     Legal Principles

Chapter 41.26 RCW provides a system for the payment of death, disability, and retirement benefits to law enforcement officers and firefighters and their beneficiaries. RCW 41.26.020. The statute provides for retirement benefits for LEOFF Plan 2 members who become "totally disabled" in the line of duty:

> A member is considered totally disabled if he or she is unable to perform any substantial gainful activity due to a physical or mental condition that may be expected to result in death or that has lasted or is expected to last at least twelve months.

RCW 41.26.470(9)(b).

These qualifying members are entitled to receive a retirement allowance equal to 70 percent of their final average salary. RCW 41.26.470(9). This allowance is offset by any wage-replacement or disability benefits provided through workers' compensation and SSD benefits. RCW 41.26.470(9)(a), (b).

As part of its implementation of chapter 41.26 RCW, DRS adopted administrative rules governing the administration of the LEOFF system. *See* WAC 415-104-015. Under the administrative rules, LEOFF Plan 2 members may be eligible for catastrophic disability retirement benefits as authorized by RCW 41.26.470(9):

> (1) **Am I eligible for a catastrophic disability allowance?** You are eligible for a catastrophic disability allowance if the department determines all of the following are true:
> (a) You incurred a physical or mental disability in the line of duty . . .;
> (b) You separated from LEOFF-eligible employment due to your disability;
> (c) Your disability is so severe that you are unable to do your previous LEOFF eligible work, and considering your education, transferable skills, and work experience, you cannot engage in any other kind of substantial gainful activity in the labor market;
> (d) Your condition has lasted or is expected to last at least twelve months, or your condition is expected to result in death; and
> (e) Your disability is not the result of your criminal conduct.

WAC 415-104-482(1).

In determining whether a member is eligible for catastrophic disability, DRS considers information submitted by the applicant, his or her physician and employer, plus other information available to DRS, including medical information, L&I, and SSA determinations. WAC 415-104-482(4). The LEOFF plan administrator determines an applicant's eligibility for catastrophic disability benefit and the rule directs DRS to "rely substantially" on SSA determinations. WAC 415-104-482(5). The rule also provides:

> (13) **Definitions.** As used in this section:
> . . . .
> (c) **Labor market** is the geographic area within reasonable commuting distance of where you were last gainfully employed or where you currently live, whichever provides the greatest opportunity for gainful employment.
> (d) **Substantial gainful activity** means any activity that produces average earnings . . . in excess of eight hundred sixty dollars a month in 2006, adjusted annually as determined by the department based on federal Social Security disability standards.[3] Wages count toward earnings when they are earned, not when you receive them. Self-employment income counts when you receive it, not when you earn it.
> (e) **Transferable skills** are any combination of learned or demonstrated behavior, education, training, work traits, and skills that you can readily apply. They are skills that are interchangeable among different jobs and workplaces.

WAC 415-104-482(13).

Whether Vorhies's disability renders him unable to perform or engage in any substantial gainful activity in the labor market within the meaning of RCW 41.26.470(9) and WAC 415-104-482(1)(c) forms the center of the dispute in this case.

III. Interpretation & Application of the Law

Vorhies argues that DRS's final order was not supported by substantial evidence when viewed in light of the whole record. Findings of fact are reviewed for substantial evidence.

---

[3] The parties agree that the amount of earnings to determine "substantial gainful activity" applicable in this case is $1,040 per month. AR at 43.

*Hegwine v. Longview Fibre Co*., 162 Wn.2d 340, 352, 172 P.3d 688 (2007). However, Vorhies assigns error to none of DRS' findings of fact. Because unchallenged DRS's factual findings are considered verities on appeal, *Darkenwald v. Emp't Sec. Dep't*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015), Vorhies's substantial evidence challenge fails. We limit our review to whether the conclusions of law flow from the unchallenged factual findings. *Cantu v. Dep't of Labor & Indus.*, 168 Wn. App. 14, 21, 277 P.3d 685 (2012).

Vorhies also seems to challenge DRS's credibility determination regarding the vocational experts. However, we do not review credibility determinations. *Scheeler v. Dep't of Emp't. Sec.*, 122 Wn. App. 484, 490-91, 93 P.3d 965 (2004). We limit our review to Vorhies's overarching argument that, pursuant to RCW 34.05.570(3)(d) and (h), DRS erroneously interpreted or applied the law and the final order was inconsistent with agency rules.

A.      Workers' Compensation Law is Not Directly Applicable

Vorhies argues that DRS erred when it refused to apply workers' compensation law to its catastrophic disability determination. We disagree.

When interpreting a statute, we first look to its plain language. *HomeStreet, Inc. v. Dep't of Revenue*, 166 Wn.2d 444, 451, 210 P.3d 297 (2009). If the statutory language is plain and unambiguous, the statute's meaning is derived from the wording itself. *HomeStreet*, 166 Wn.2d at 451.

LEOFF is administered by DRS. RCW 41.50.055. DRS adopted administrative rules to implement three different disability benefits authorized by RCW 41.26.470: (1) non-duty disability retirement; (2) line-of-duty disability retirement; and (3) catastrophic duty disability retirement. *See* WAC 415-104-485, -480, -482.

In contrast, the workers' compensation program is administered by L&I under title 51 RCW. It generally provides benefits for workers whose ability to maintain their covered employment has been affected by work-related injuries or diseases.

LEOFF Plan 2 members are also covered by parts of the workers' compensation program. RCW 41.26.480. There are only two references to workers' compensation under LEOFF. RCW 41.26.470(2) addresses the condition for cancelling a disability retirement benefit if the retiree is no longer entitled to benefits under workers' compensation. RCW 41.26.470(9) provides that the amount of catastrophic disability benefit shall be offset by temporary disability wage replacement benefits or permanent total disability benefits the retiree also receives under workers' compensation. Neither of these references directs LEOFF plan administrators to apply workers' compensation law in their disability retirement determinations. And the legislature has not created any other connection between workers' compensation and LEOFF in the LEOFF statute. *See* RCW 41.26.470.

The LEOFF statute for catastrophic disability and its implementing rule are unambiguous. RCW 41.26.470(9)(b); WAC 415-104-482. The test is whether the member can "engage in" any substantial gainful activity, not whether a member can perform or "obtain" gainful employment. WAC 415-104-482(1)(c). The meaning of "engage" is unambiguous and plain on its face. Vorhies argues that the LEOFF standard should be based on his ability to obtain employment, but this is a different standard applied to the determination of a different type of benefit under workers' compensation law. That an eligibility determination is based on the applicant's ability to obtain employment appears nowhere in the LEOFF rules for catastrophic benefit determinations.

The LEOFF rules seem to recognize L&I's separate responsibility for work-related injury and disease claims by advising LEOFF disability retirement applicants that DRS "consider[s]"

12

determinations made by L&I.[4]  However, the rules do not direct how DRS is to use the information, nor do they direct DRS to use the information at all.  Specifically, regarding the determination for catastrophic benefits, workers' compensation is only referenced by advising applicants that DRS "consider[s]" L&I determinations, and that catastrophic benefits are offset by other disability benefits, including workers' compensation and SSD.  WAC 415-104-482(4)(b), (8).

The definitions of LEOFF terms "[l]abor market" and "[t]ransferable skills," WAC 415-104-482(13), closely resemble workers' compensation terms defined in L&I regulations for vocational rehabilitation.  *See* WAC 296-19A-010(4).  However, there is no indication that the LEOFF rule for catastrophic disability retirement simply adopted L&I language, nor does it reference L&I rules.

In support of his argument that the two statutory schemes are connected, Vorhies points out that workers' compensation law defines "'permanent total disability'" as a "'condition permanently incapacitating the worker from performing any work at any gainful occupation.'" Resp't's Br. at 13 (quoting RCW 51.08.160).  He cites to *Leeper v. Department of Labor & Industries*, a workers' compensation case which held that evidence of a worker's inability to obtain employment was relevant to determining if an injury left a worker permanently and totally disabled.  123 Wn.2d 803, 805-06, 872 P.2d 507 (1994).  There, the court reasoned that availability of jobs in the labor market does not imply that the worker can obtain such a job because it disregards potential vocational evidence unique to the worker.  *Leeper*, 123 Wn.2d at 818.

Vorhies also cites to *Fochtman v. Department of Labor & Industries*, another workers' compensation case where the court held that total disability may be established by expert testimony as to whether the worker is able to "maintain gainful employment" in the labor market.  7 Wn.

---

[4] WAC 415-104-482(4)(b); WAC 415-104-480(5)(a); WAC 415-104-485(5)(a).

App. 286, 298, 499 P.2d 255 (1972). He further cites to our recent opinion in *Shaw v. Department of Retirement Systems*, which discussed LEOFF duty disability retirement determinations. 193 Wn. App. at 130. *Shaw* held that a worker was required to prove that his mental disease arose naturally and proximately from his employment for purposes of determining whether the workers' disability was incurred in the line of duty. 193 Wn. App. at 130-33.

These cases, however, interpret workers' compensation law or address LEOFF benefits not at issue in this case. DRS need not rely on worker's compensation law in making its determination in this case.

Vorhies further asserts that because "substantial gainful activity" means any activity producing average earnings in excess of $1,040 per month, we should only consider jobs in which Vorhies can actually obtain and, thus, produce earnings. Resp't's Br. at 15. He equates the LEOFF language, "engage in" substantial gainful activity with workers' compensation language, "obtain gainful employment."

However, the test under the LEOFF rules is whether his disability is "so severe" that he "cannot engage in any other kind of substantial gainful activity in the labor market." WAC 415-104-482(1)(c). Whether Vorhies is or is not employed, or whether he has tried nor not tried to obtain employment, is not determinative for catastrophic disability retirement benefits.

There are some similarities in language between the two statutory schemes, and LEOFF makes limited reference to workers' compensation in its statutes and rules. However, workers' compensation is a unique statutory scheme where the type of benefits differ and the eligibility for benefits is analyzed differently. LEOFF authorizes catastrophic disability retirement benefits on its own terms, independent of benefits available through workers' compensation. The two statutory schemes maintain separate identities unless expressly stated in the statutes. *See Taylor*

14

*v. City of Redmond*, 89 Wn.2d 315, 318-20, 571 P.2d 1388 (1977). By its express terms, LEOFF statutes and rules do not require DRS to apply workers' compensation law when determining eligibility for catastrophic disability retirement benefits.

For these reasons, we decline to import workers' compensation law into the LEOFF statutory scheme for catastrophic disability benefits, and to redefine DRS's explicit standards. Because workers' compensation law does not apply to LEOFF catastrophic disability determinations, and because the LEOFF statute and rule are plain on their face, we conclude that DRS did not erroneously apply or interpret the law.

B.     Standard of Proof

Vorhies next argues that DRS's final order erroneously contained the incorrect standard of proof when it concluded that his "'transferable skills make it quite plausible that he could earn compensation greater than $10.18 per hour, in which case fewer hours of work would be needed to reach the threshold.'" Resp't's Br. at 41 (quoting AR at 44)[5]. We disagree.

A LOEFF retiree challenging a DRS decision bears the burden of proof to show that the decision is invalid. RCW 34.05.570(1)(a); WAC 415-08-420(2). Pursuant to WAC 415-04-035, the retiree "must provide sufficient information to outweigh the information that the plan administrator used in making the administrative determination that is being reviewed."[6] Vorhies misunderstands the standard of proof and misinterprets the final order.

---

[5] Vorhies incorrectly cites to conclusion of law 52. The correct conclusion of law is 53, to which he properly assigned error.

[6] This standard appears to be the same as the "preponderance of the evidence" standard, which requires that the "evidence establish the proposition at issue is more probably true than not true." *Mohr v. Grant*, 153 Wn.2d 812, 822, 108 P.3d 768 (2005).

A closer review of DRS's conclusion of law 53 in its entirety shows that DRS employed the correct standard of proof:

> *It would take . . . just under 24 hours per week, at the lowest wage appearing in Ms. Berndt's job classification list, $10.18 per hour, to reach the $1040 per month threshold*. Alternately walking, standing and sitting, he has the physical capacity to engage in income-producing activity for less than five hours a day in a standard five-day work week, the most that would be required at the lowest wage.
> *There is no evidence that the job classifications listed by Ms. Berndt require more education that Mr. Vorhies has, and he is equipped to learn and perform the tasks generally expected within these classifications by virtue of his varied transferable skills*.

AR at 44 (emphasis added). Only after this conclusion does the final order state: "Mr. Vorhies' transferable skills make it quite *plausible* that he could earn compensation greater than $10.18 per hour, in which case fewer hours of work would be needed to reach the threshold." AR at 44 (emphasis added).

The final order clearly concludes that Vorhies had the skills and education to reach the $1,040 per month threshold if he worked at the lowest wage for five hours per day in a standard five-day work week. The relevant analysis and conclusion ends there. The subsequent statement that it is plausible that Vorhies could earn compensation *greater* than the lowest wage is not the central thrust of this conclusion. We, therefore, conclude that DRS's final order was based on the correct standard of proof.[7]

---

[7] In support of his argument, Vorhies cites to *Dillon v. Seattle Police Pension Bd.*, 82 Wn. App. 168, 916 P.2d 956 (1996), and *Woldrich v. Vancouver Police Pension Bd.*, 84 Wn. App. 387, 928 P.2d 423 (1996). However, neither *Dillion* nor *Woldrich* involved the requirements for LEOFF catastrophic disability benefits. Those cases determined that the test for whether a disability was incurred in the line of duty for duty disability retirement was whether the disability arose naturally and proximately from the LEOFF member's employment. *Dillon*, 82 Wn. App. at 171; *Woldrich*, 84 Wn. App. at 390. These cases are irrelevant to Vorhies's assignment of error.

C.     "Obtain and Perform Gainful Employment"

Vorhies next contends that in order to deny LEOFF catastrophic disability benefits, the applicant must be able to "obtain and perform gainful employ[]ment." Resp't's Br. at 43. He argues that the test outlined in the final order is "simply wrong," and that if a person cannot get a job, it does not matter that the person might be able to physically perform that job. Resp't's Br. at 43. He further argues that if a person can get a job, but cannot be competitive or perform in the job, it is not gainful employment.

Vorhies provides no substantive argument or authority to support this contention. RAP 10.3(a)(6); *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 808, 225 P.3d 213 (2009). Further, and as discussed above, the test is not whether Vorhies can obtain employment. The test is whether Vorhies can engage in substantial gainful activity; that is, whether he can engage in some kinds of work that are available in his labor market. Whether Vorhies can obtain any specific kind of work not determinative, nor is whether or not he is employed.[8] Vorhies asserts the incorrect test. We, therefore, conclude that DRS did not erroneously apply or interpret the law.[9]

---

[8] Vorhies also argues that because Berndt was unable to testify whether the jobs she found were full-or part time, and because the Final Order stated he could engage in income-producing activity for "'less than five hours per day in a standard five-day work week,'" Berndt's testimony did not support the conclusion that he could work part-time jobs. Resp't's Br. at 33 (quoting AR 44). This argument is incorrect.

Berndt opined that Vorhies could resume full-time work or near full-time work. She stated that there were jobs in his labor market that used his skills and physical abilities. She also opined that he possessed the skills and physical abilities to earn the threshold earning capacity. The final order did state that Vorhies was able to engage in income-producing activity "for less than five hours a day in a standard five-day work week." AR at 44. But this was in reference to the conclusion that, in order to meet the $1,040 per month threshold, Vorhies only needed to work 24 hours a week, at the lowest wage, in order to meet the threshold earning capacity. Therefore, Berndt's opinion did support the conclusion that Vorhies could work part-time jobs.

[9] RCW 41.26.470(9) does not use the terms "obtain" or "employment."

D.      Headaches

Vorhies next argues that DRS erroneously failed to consider headaches in its eligibility determination.

However, Vorhies did not assert headaches or a psychiatric condition as a disability in his LEOFF disability retirement application.  The only disability at issue is Vorhies's neck pain, a physical disability for which he received duty disability retirement benefits.  Because Vorhies did not assert headaches as a disability and because headaches did not form the basis of his LEOFF disability retirement application, we conclude that DRS did not err when it did not consider headaches in its eligibility determination.

E.      Res Judicata

Vorhies next argues that DRS's final order erroneously concluded that his duty disability retirement does not by itself prove that any of the elements for catastrophic disability retirement are met.  He seems to argue that the previous DRS finding for duty disability retirement benefits is res judicata for catastrophic disability retirement benefits.[10]

As a threshold matter, Vorhies does not assign error to conclusion of law 35 on which this argument is based, nor does he list it as an issue pertaining to an assignment of error.  RAP 10.3(a)(4).  Providing little argument, he cites no authority other than *Malland v. Department of Retirement Systems*, which clarified that the application of res judicata does not contravene the purposes of the LEOFF statute and that it is limited to the terms of the statute.  103 Wn.2d 484, 490-91, 694 P.2d 16 (1985).

---

[10] Vorhies's argument here is unclear.  DRS does not seem to address the issue and briefly states that there is no disagreement that Vorhies receives duty disability for his neck injury.

18

Even if we review the issue, there is no res judicata in this case. *Hisle v. Todd Pacific Shipyards Corp.*, 151 Wn.2d 853, 865-66, 93 P.3d 108 (2004). While DRS's previous approval of Vorhies's duty disability retirement benefits may prove some elements of catastrophic disability retirement eligibility, it is not res judicata of the central element—that his disability is "so severe" that he "cannot engage in any other kind of substantial gainful activity in the labor market." WAC 415-104-482(1)(c). This element is not required for duty disability benefits and was not addressed in the previous DRS determination. WAC 415-104-480(1). Therefore, there is no res judicata as to Vorhies's eligibility under WAC 415-104-482(1) for catastrophic disability benefits.

F.     Current Skills

Vorhies next argues that DRS's final order erroneously concluded that he "'has the capacity to quickly acquire'" the skills to perform the typical duties of some jobs. Resp't's Br. at 46 (quoting AR at 43). He argues that DRS mistakenly concentrated on what he might learn to do in the future, as opposed to what he is able to do now. We disagree.

In determining eligibility for catastrophic disability benefits, DRS considers the applicant's transferable skills which, by its broad definition, includes skills that the applicant can readily apply in addition to "any combination of *learned or demonstrated behavior*." WAC 415-104-482(13)(e) (emphasis added). Vorhies's ability to quickly acquire and learn new skills and his creative thinking are examples of demonstrated behaviors.

Further, DRS did not focus its analysis solely on Vorhies's capacity to acquire new skills. It also concluded that Vorhies "already has skills to perform the typical duties" of at least some jobs requiring only sedentary to light physical activity. AR at 43. We, therefore, conclude that DRS's final order did not erroneously apply the law.

G.    Age

Vorhies next argues that DRS erroneously failed to consider his age when it concluded that an applicant's age is not an eligibility factor in WAC 415-104-482(1). He argues that when given a choice between two competitive potential employees, an employer might choose the younger candidate who can serve in the position longer. He further argues that nothing in the statute or rule forbids DRS from considering age.

Both RCW 41.26.470(9) and WAC 415-104-482 make no mention that an applicant's age is a factor DRS is required to consider when determining eligibility. While the statute and rule does not forbid DRS from considering age, this does not in turn mean that it is error if DRS does not consider it. Further, Vorhies presented no evidence that, for example, he applied for and lost employment due to his age, or that his age affected the results of his PCEs.[11] He also provided no authority in support of his arguments. RAP 10.3(a)(6); *Satomi*, 167 Wn.2d at 808. Because DRS is not required to consider age as a factor in its determinations for catastrophic disability retirement, we conclude that DRS did not erroneously apply the law.

H.    Workplace Accommodations

Vorhies next argues that DRS erroneously concluded that he must prove that an employer would not provide workplace accommodations when attempting to employ him on a part-time basis. He argues that nothing in the statute or rule requires proof of potential accommodations and that the only reasonable approach is to determine what jobs normally require and whether he can obtain such jobs and perform within those requirements. We disagree.

---

[11] Larson testified using age as a factor in evaluating an applicant's ability to engage in substantial gainful activity. DRS acknowledged her testimony but concluded that a "claimant's age may be a factor in [SSD] or in workers' compensation, but an applicant's age is not an eligibility factor in WAC 415-104-482(1)." AR at 45.

Vorhies directs us to a specific sentence in conclusion of law 56:

In much the same vein, [Larson] acknowledged that some employers provide accommodations such as ergonomic workstations, chairs, different keyboards and headsets, but avoided discussing possible accommodations.

AR at 46.

When this statement is read within the context of the entire final order, Vorhies's inference is incorrect. This statement was made in reference to Larson's discussion on the severity of Vorhies's disability and the labor market. The final order discussed several weaknesses in Larson's testimony, and pointed out that Larson did not consider the full content of the PCEs in reaching her opinions. Ultimately, DRS gave Berndt's testimony "greater credit" over Larson's testimony. AR at 46.

DRS did not require Vorhies to prove that an employer would not provide workplace accommodations to be eligible for catastrophic disability benefits. Nor is the "reasonable approach" Vorhies asserts the correct test in determining eligibility for catastrophic disability retirement benefits. We, therefore, conclude that DRS did not erroneously apply the law.

IV.    Attorney Fees

Lastly, Vorhies argues that pursuant to the Equal Access to Justice Act (EAJA), we should affirm the superior court's award for attorney fees and costs. He also requests that we award him costs and fees in this appeal pursuant to the EAJA and RAP 18.1.

Under the EAJA, a court awards attorney fees and other expenses to a qualified party that prevails on judicial review of an agency action, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. RCW 4.84.350(1); *ZDI Gaming, Inc. v. Wash. State Gambling Comm'n*, 151 Wn. App. 788, 812-13, 214 P.3d 938, *aff'd*, 173 Wn.2d 608 (2012).

Because of our conclusion affirming DRS's Final Order, we reverse the superior court's award for attorney fees. And because Vorhies is not the prevailing party in this appeal, we decline to award attorney fees.

We affirm DRS's final order and, therefore, reverse the superior court.

_____
Melnick, J.

We concur:

_____
Bjorgen, C.J.

_____
Lee, J.